IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 25, 2014

## JOHN R. WILLS, JR. V. THE CITY OF MEMPHIS ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH1118143     Kenny W. Armstrong, Chancellor**

———————————————————

**No. W2013-01861-COA-R3-CV - Filed August 13, 2014**

———————————————————

Landowner filed a petition for writ of certiorari in the Chancery Court of Shelby County, seeking review of the City of Memphis City Council's decision to deny the landowner's petition to subdivide his Belle Meade Subdivision lot into two lots. The trial court reversed the City Council's decision, finding that the landowner had satisfied the requirements for subdivision under the Uniform Development Code, and remanded the case for rehearing before the City Council. On remand, the City Council's review was limited to the record established at the previous hearing. For the reasons discussed herein, we affirm in part and vacate in part, and remand to the trial court with instructions to remand to the City Council for reconsideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Allan J. Wade and Brandy S. Parrish, Memphis, Tennessee, for the appellants, The City of Memphis and Memphis City Council.

Ricky E. Wilkins and Sharon H. Loy, Memphis, Tennessee, for the appellee, John R. Wills, Jr.

## OPINION

Appellee John R. Wills, Jr. is the owner of Lot 94 in the Belle Meade Subdivision in

Memphis. Lot 94 is located at the northwest corner of Poplar Avenue and Belle Meade Lane. Belle Meade Subdivision contains approximately 94 lots and is zoned R-10.[1] R-10 zoning permits single-family homes on lots with a minimum lot size of 10,000 square feet, and a minimum lot width of 60 feet.

On April 27, 2011, after a fire destroyed the existing house on the property, Mr. Wills filed an application for subdivision of Lot 94 with the Memphis and Shelby County Office of Planning and Development ("OPD").[2] By his application, Mr. Wills sought to have Lot 94 divided into two lots, proposed Lot 94A and proposed Lot 94B. The typical lot in Belle Meade Subdivision is 20,000 square feet, rectangular in shape, and has approximately 100 feet of street frontage. Lot 94 is atypical in that it is one of the largest lots in the Subdivision, containing approximately 31,247 square feet, with 226.98 feet of street frontage on Belle Meade Lane.[3] Thus, as Mr. Wills argues, Lot 94 is one of the few (or only) lots in Belle Meade Subdivision that could be divided into two lots that each meet the R-10 zoning restrictions of 10,000 square foot lots, with at least 60 feet of street frontage. According to Mr. Wills' application, Proposed Lot 94A, which would be the corner lot at Poplar Avenue and Belle Meade Lane, would contain 14,004 square feet in area with 116 feet of street frontage. Proposed Lot 94B would contain 16,672 feet, with 104.98 feet of frontage along Belle Meade Lane.

It is undisputed that Mr. Wills' application is governed by the provisions contained in the original version of the Unified Development Code ("UDC"), which was approved by

---

[1] As established by the record, Belle Meade Subdivision was originally established containing 94 lots. Currently, it contains approximately the same number of lots; however, there have been alterations to some lots over the years. For example, the lot immediately to the north of Mr. Wills' property, 281 Belle Meade Lane, is "the south part of Lot 93, Clark & Fay Belle Meade Subdivision as shown on plat of record in Plat Book 12 Page 26 and part of Lot 31 Re-Subdivision of Lot B and part of Lot A Tuckahoe Subdivision as shown on plat record in Plat Book 14 Page 14." The re-subdivision of Lot B and part of Lot A Tuckahoe Subdivision occurred in January 1950.

[2] At the time the application was filed, the home that had been destroyed by fire was still on the property. Mr. Wills proposed to tear down what remained of the existing home and replace it with two homes on the subdivided lot. At the time the City Council considered Mr. Wills' resolution request, the existing home had been removed. By the time of the trial court hearing, Mr. Wills had completed construction of a new home on the north side of Lot 94. There is no dispute in the record concerning whether the new construction complies with applicable building requirements.

[3] Appellants contend that there is a dispute of fact concerning whether Lot 94 is atypically large for the Belle Meade Subdivision. However, our review of the record, including plat drawings of the other lots in the subdivision, indicates that Lot 94 is larger than most of the other lots in the subdivision.

the Memphis City Council and the Shelby County Board of Commissioners in August 2010, and was effective from January 1, 2011 to August 27, 2012. The UDC is the development code for the City of Memphis (together with the Memphis City Council, "Appellants") and unincorporated Shelby County. Prior to adoption of the UDC by the Memphis City Council and the Shelby County Commission, subdivisions in the City of Memphis were governed by the Subdivision Regulations, which were adopted by the City Council as Ordinance No. 3352 on December 20, 1983 ("Subdivision Regulations").

Mr. Wills' application was considered a "major preliminary plan," under Section 9.7.4(B) of the UDC. The UDC delegates review and approval authority for all major preliminary subdivision plans to the Planning Director and the Memphis and Shelby County Land Use Control Board ("LUCB"), subject to appeal to the Memphis City Council. The "Planning Director" refers to the director of the Memphis and Shelby County Division of Planning and Development a/k/a the Office of Planning and Development ("OPD"). The UDC confers "reviewing authority" on the Planning Director to review and make recommendations regarding major preliminary subdivision plans. The Planning Director may designate a staff member to represent him or her in any function assigned to the Planning Director.

Under Section 9.3.1(B) of the UDC, Mr. Wills was required to attend a mandatory pre-application conference with the Planning Director "to discuss the procedures, standards and regulations required for approval in accordance with this development code." Mr. Wills was required to submit the complete application, containing all of the information necessary for the Planning Director to "decide whether or not the development as proposed will comply with all of the requirements of this development code." Section 9.3.3.E(3) provides that "the applicant may rely on the recommendations of the Planning Director as to whether more or less information" is required. There is no indication in the record that Mr. Wills was informed that his application failed to conform to any of the technical requirements of the UDC, or that any further information was required.

After the application is submitted, Section 9.7.7(D) of the UDC provides that:

> 1. Upon submission of a completed application, the Planning Director may schedule the major preliminary plan for review by the Technical Review Committee. If applicable, the Technical Review Committee shall review the major preliminary plan for consistency with the requirements of this development code.
>
> 2. Upon completion of the technical review, the Planning Director may meet with the applicant to discuss any changes in

the development design.

> 3. The Planning Director shall prepare a report that reviews the application in light of comments provided by the Technical Review Committee, any plans to be considered (*See* Chapter 1.9) and the general requirements of this development code. The report, preliminary plan and any related application materials shall be forwarded to the Land Use Control Board.

In this case, the Planning Director complied with the foregoing sections by preparing a report that expressly provides that "the proposed re-subdivision meets the technical requirements of the Unified Development Code." Mr. Wills' application then moved to the LUCB for approval.

> Section 9.7.7(E) of the UDC outlines the LUCB's action as follows:

> > 1. Not less than 35 or more than 75 days after an application has been determined complete, the Land Use Control Board shall hold a public hearing and Notification.

> > 2. The Land Use Control Board shall approve, approve with conditions, or reject the major preliminary plan after deliberation and prior to the close of the public hearing. The Land Use Control Board may, prior to the close of the public hearing, take the matter under advisement or defer decision until the next regular meeting of the Board.

On June 9, 2011, the LUCB considered Mr. Wills' application and denied it by a vote of 1–8. Thereafter, on or about June 15, 2011, Mr. Wills appealed the LUCB's decision to the Memphis City Council. On August 16, 2011, after due notice was sent to all interested landowners, the Memphis City Council considered Mr. Wills' proposed resolution overturning the LUCB's rejection of his application to re-subdivide Lot 94. The resolution failed by a vote of 3–10.

On November 4, 2011, Mr. Wills filed a petition for writ of certiorari in the Shelby County Chancery Court, seeking review of the LUCB and Memphis City Council's rejection of his application. On November 17, 2011, the Chancellor signed a Fiat, ordering the issuance of a writ of certiorari as prayed for by Mr. Wills in his petition. Pursuant to the writ, on December 21, 2011, the City filed the affidavit of Valerie Snipes, Deputy Comptroller for the City of Memphis. Ms. Snipes attached, to her affidavit, a true and exact copy of the

City Council's proceedings as maintained by the City Comptroller. The attachments include a certified copy of the Resolutions, approved minutes of the meeting, a written report from the OPD, records from the LUCB, and other documents presented to the Council during the meeting.

The matter was heard by the trial court on April 22, 2013. At that time, the trial court ordered the parties to brief the issue of what evidence the court may consider, the remedies available, and the question of whether Section 3.9.2 of the UDC is applicable. Following the submission of the parties' trial briefs and hearing, the court entered a Memorandum Opinion on July 10, 2013, finding in favor of Mr. Wills and remanding the matter to the City Council with instructions. Specifically, the order states, in relevant part, that:

> In its meeting considering this application, the City Council heard from neighboring property owners and their attorney who opposed the application on the ground that the proposed subdivision was not in keeping with the character of the neighborhood. They described Belle Meade as one of the last existing Memphis neighborhoods with large lots. The neighbors also expressed fears regarding traffic congestion at the intersection of Poplar and Belle Meade Lane where the re-subdivision is proposed. The objections raised at the City Council's meeting on August 16th were the same objections and fears raised in 2000 by neighbors when the City Council approved the application to allow the lot directly across the street to be divided into two lots. During its meeting on the instant application, one City Council member who opposed approval of the application stated he grew up in the neighborhood and requested the support of the rest of the City Council members in siding with him and the neighbors. Another City Council member who lives near the Belle Meade subdivision and represents the area on the City Council stated he would be voting with the neighbors and implored his colleagues to join with him opposing the application to subdivide Lot 94.
>
> Before the vote by the City Council, the OPD's professional staff provided detailed information about the proposed subdivision of Lot 94 and reported that the two proposed lots fully complied with all existing zoning regulations. OPD further pointed out that neighbors' concern about future re-subdivision of other lots in Belle Meade was misguided since most other lots in Belle Meade were too small

to be subdivided into two lots and meet the R-10 zoning requirements for lot size and frontage. OPD further pointed out that while the two lots proposed were smaller in size than the typical lot in Belle Meade, there were currently lots in Belle Meade smaller than these two lots.

*                              *                              *

In reviewing the transcript of the City Council meeting in this case, the opposition to the application to subdivide Lot 94 centered entirely around the neighbors' fears that approval of [Mr. Wills'] application would change the character of Belle Meade. The two City Council members who publicly expressed their opposition during the meeting echoed the same sentiments as the neighbors. No zoning requirements were cited or discussed by the City Council as a basis to reject [Mr. Wills'] application. Nor was any evidence presented or introduced into the record to support the claim that approval of the application would adversely impact the character of Belle Meade. Also, prior to voting, the City Council never discussed any other consideration for its denial of the application. While the City now argues that the proposed lots do not meet the requirements of the . . . UDC with respect to lot width or frontage, a review of the record reveals this was not discussed during the City Council's meeting. In fact, the only reference to the UDC was the staff report prepared by the OPD which was available to City Council members during its meeting and is part of the record in this case. The OPD report specifically states that the proposed re-subdivision meets all of the technical requirements of the UDC. As such, the City Council's decision to deny the application could not have been based on a determination by the City Council that the infill compatibility standards of the UDC were not met by the proposed lots.

In this case, the Court finds from the record that the City Council made its decision to deny [Mr. Wills'] application solely upon the expressed concerns of neighbors which were not substantiated by any evidence introduced into the record. The law is well settled that community fears and concerns should not be the basis for denying an application which otherwise complies with all of the conditions and technical requirements

-6-

of the specified zoning ordinance. . . . As such, the Court is compelled to find that the City Council's decision to reject [Mr. Wills'] application is not supported by substantial and material evidence and is, therefore, arbitrary and capricious. As found by OPD, [Mr. Wills'] proposal to subdivide his lot complies with R-10 zoning and the UDC enacted by the City. To allow applications such as the one submitted by [Mr. Wills] to be decided based on the unsupported fears and concerns of neighbors would effectively invalidate zoning requirements and ordinances enacted by the City.

The matter is remanded to the City Council with instructions to grant the permit unless there is a finding that the proposed re-subdivision does not comply with duly enacted zoning regulations and requirements for Belle Meade Subdivision.

On July 31, 2013, Mr. Wills filed a motion to alter or amend the Memorandum Opinion. Therein, Mr. Wills asked the court to "amend its findings, make additional finding, and/or alter or amend the judgment in order to:"

1. State whether the City's attempt to argue for the first time at judicial review that [Mr. Wills'] application failed to comply with the UDC is proper;

2. State what additional evidence, if any, may be considered by the Memphis City Council when it reconsiders the matter on remand;

3. State whether the statements and/or behavior by the two Council Members who opposed the opposition to [Mr. Wills'] application was appropriate and whether these specific Council Members may take part in the hearing and vote on remand;

4. In the event the Court rules that the City may raise the issue of contextual infill development standards on remand, state whether the contextual infill development standards provision of the UDC apply to [Mr. Wills'] application . . . .

Appellants opposed the motion to alter or amend. Following hearing on the motion, on

October 18, 2013, the trial court entered an order, which states, in relevant part, that:

> 2. The Court finds that [Mr. Wills'] application complies with all provisions of the . . . UDC.
>
> 3. Upon remand, the Memphis City Council shall not consider any additional evidence from any party or person that [Mr. Wills'] application fails to comply with the UDC.
>
> 4. Upon remand, the Memphis City Council may not consider any additional evidence from any parties or persons beyond the record at the time of the hearing before the Memphis City Council on August 16, 2011.
>
> 5. The Court denies [Mr. Wills'] request that certain council members must recuse themselves from participating in the hearing on [Mr. Wills'] application upon remand to the Memphis City Council.
>
> 6. As amended by this Order, the Court's Memorandum Opinion dated July 10, 2013 remains in full force and effect.

Appellants appeal. They raise six issues for review, as stated in their brief:

> 1. Whether the trial court erred by applying an incorrect legal standard for considering a common law writ of certiorari?
>
> 2. Whether the trial court erred in finding that the Memphis City Council's decision to reject [Mr. Wills'] application for re-subdivision of Lot 94 in Belle Meade Subdivision was arbitrary and capricious?
>
> 3. Whether the trial court erred in finding that the City Council made its decision to deny [Mr. Wills'] application solely upon the expressed concerns of neighbors which were not substantiated by any evidence introduced into the record?
>
> 4. Whether the trial court erred in finding that [Mr. Wills'] application for re-subdivision of Lot 94 in Belle Meade Subdivision complies with all provisions of the [UDC]?

-8-

5. Whether the [OPD's application] of outdated Subdivision Regulations to [Mr. Wills'] subdivision application requires remand?

6. Whether the trial court's remand instructions erroneously prohibit the Memphis City Council from considering any additional evidence on the issue of whether [Mr. Wills'] application fails to comply with the UDC?[4]

In its Memorandum Opinion, the trial court stated the applicable standard of review for common law writs of certiorari as follows:

> The Court's standard of review in these matters is limited to whether the City exceeded its jurisdiction or acted illegally, arbitrarily, or fraudulently. *McCallen v. City of Memphis*, 786 S.W.2d 633, 638 (Tenn. 1990). A decision that is not supported by substantial and material evidence is by definition considered to be arbitrary and capricious.

We begin by noting that the City Council was acting in an administrative capacity exercising judicial or quasi-judicial powers in this case rather than in a legislative capacity.[5] *See, e.g.*, *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990) (stating "a crucial test in distinguishing legislative from administrative acts is whether the action taken (resolution or ordinance) makes new law or executes one already in existence."). Here, the rejection of Mr. Wills' subdivision application required the City Council to apply existing law; thus, the Council's decision is administrative in nature.

It is well settled that the common law writ of certiorari is the proper method for

---

[4] In his brief, Mr. Wills asserts that the City Council violated his procedural due process rights by allowing the neighbors to submit a packet of photographs and information for consideration because he was not provided the documents prior to the public hearing. Mr. Wills also argues that the statements of two City Council members opposing the subdivision violated his procedural due process rights. Mr. Wills, however, failed to raise these arguments as issues on appeal. These issues are, therefore, waived. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (holding that an appellee may waive arguments on appeal by failing to designate them as issues in a Statement of the Issues section of his or her appellate brief).

[5] The term "administrative" is used interchangeably with "judicial" or "quasi-judicial." *Wilson County Youth Emergency Shelter, Inc. V. Wilson County*., 13 S.W.3d 338, 342 (Tenn. Ct. App. 1999) (citing *McCallen*, 786 S.W.2d at 638).

challenging an administrative action of a board, commission, or legislative body. *McCallen*, 786 S.W.2d at 634; *Abbington Ctr., L.L.C. v. Town of Collierville*, 393 S.W.3d 170, 175 (Tenn. Ct App. 2012); *Steppach v. Thomas*, 346 S.W.3d 488, 498–99 (Tenn. Ct. App. 2011). The common law writ of certiorari is an order from a superior court to an inferior tribunal or board to send up the record for review. *Utley v. Rose*, 55 S.W.3d 559, 563 (Tenn. Ct. App. 2001). Review under the common law writ of certiorari is generally limited to the record made before the lower tribunal or board. *421 Corp. v. Metro. Gov't of Nashville & Davidson County*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000). "It envisions that the court will review the record independently to determine whether it contains 'such relevant evidence that a reasonable mind might accept as adequate to support a rational conclusion.'" *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000) (quoting *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992)). A court reviewing the decision of a local board is not permitted to re-weigh the evidence, *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980), inquire into the intrinsic correctness of the lower tribunal's decision, *Arnold v. Tenn. Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997), or substitute its judgment for that of the lower tribunal or board, *421 Corp.*, 36 S.W.3d at 474. In *Harding Academy v. Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 359 (Tenn. 2007), our Supreme Court stated:

> This writ provides a limited scope of review by the courts. Review of [a board's] action in this case is limited to determining whether the board exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision. In proceedings involving a common law writ of certiorari, illegal, arbitrary, or fraudulent actions include: 1) the failure to follow the minimum standards of due process; 2) the misrepresentation or misapplication of legal standards; 3) basing a decision on ulterior motives; and 4) violating applicable constitutional standards. . . .

*Id*. at 363.

On the issue of whether material evidence exists to support the decision of the lower tribunal or board, the reviewing court is prohibited from receiving new or additional evidence. *Weaver v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 786 (Tenn. Ct. App. 2003); *Massey v. Shelby County Retirement Bd.*, 813 S.W.2d 462, 465 (Tenn. Ct. App. 1991). When reviewing the evidentiary basis for a local board's decision, the question of whether the record contains material evidence to support the board's decision becomes a question of law. *Lafferty*, 46 S.W.3d at 759; *see also Pack v. Royal-Globe Ins. Companies*,

457 S.W.2d 19, 22 (Tenn. 1970); *Boyce v. Williams*, 389 S.W.2d 272, 276 (Tenn. 1965); *Weaver*, 122 S.W.3d at 784. The decision of a local board will only be considered arbitrary when it is determined that the record contains no evidence to support the decision. *Lafferty*, 46 S.W.3d at 759 (citing *Sexton v. Anderson County*, 587 S.W.2d 663, 667 (Tenn. Ct. App. 1979)); *Watts*, 606 S.W.2d at 276–77. New or additional evidence may only be received by the reviewing court on the issue of whether the lower tribunal or board exceeded its jurisdiction or acted in an illegal, arbitrary, or capricious manner. *Massey*, 813 S.W.2d at 465; *see also Watts*, 606 S.W.2d at 277; *Weaver*, 122 S.W.3d at 786.

Based upon its finding that the City Council's decision to reject Mr. Wills' application was not supported by "substantial and material" evidence, the court found that the decision was arbitrary and capricious under the foregoing standard of review. In the brief, Appellants first contend that the trial court erroneously applied the standard for judicial review of an administrative decision pursuant to the Tennessee Uniform Administrative Procedures Act ("UAPA"), by requiring "substantial and material evidence." Appellants argue that the correct standard, under *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256 (Tenn. 2009), is whether the City Council's decision is supported by "**any** material evidence." *Id.* at 262 (emphasis added). In *Davis*, the Supreme Court distinguished between the UAPA standard and the common law writ of certiorari standard, noting that, "[u]nder common law writ of certiorari review, a board's determination is arbitrary and void if it is unsupported by **any material evidence**." *Id*. (citing *Watts*, 606 S.W.2d at 276–77) (emphasis added). In *Heyne v. Metropolitan Nashville Board of Public Education*, our Supreme Court defined the nature and quantum of evidence needed to uphold a board's decision under certiorari review:

> For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992) (quoting *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965)). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d at 904.

*Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 738 (Tenn. 2012). While we concede that the evidence standard, under a writ of certiorari, is somewhat less than "substantial" and material evidence, the distinction between "substantial and material evidence" and "any material evidence" is a distinction without difference in the context of this case, and in light of our decision to remand back to the City Council, *infra*.

As evidenced by the OPD's staff report, there was opposition from the neighbors to Mr. Wills' subdivision request. According to the OPD, the opposition was based on concerns regarding the "lot size compatibility" of proposed Lots 94A and 94B as compared to other lots in the Belle Meade Subdivision. The report from the OPD concedes that the neighbors' concerns regarding erosion of the character of Belle Meade Subdivision, one of the "few larger lot subdivisions in the City," were warranted. Nevertheless, the OPD distinguishes "lot size compatibility" from "street character compatibility," and concludes that Mr. Wills' proposal is not out of character with the neighborhood because it matches the "street character" of the two lots directly across the street. Street character refers to lot width and front set backs. The lots across the street from Lot 94 were re-subdivided in 2000, and are the smallest lots in the subdivision.[6] Proposed Lots 94A and 94B would be smaller than the two lots across the street; however, the OPD opined that the size difference would not be visible from the street because Mr. Wills' proposal matched the lot width and set backs from Poplar Avenue and Belle Meade Lane of the lots across the street. Thus, the crux of OPD's opinion is that the "street character" is "arguably more important than the overall size [of the lots] since the character and compatibility of the development is most noticeable from the front of the lot along the street and not in the back yard which is not visible from the street."

It is undisputed that the Subdivision Regulations governing subdivision application in Memphis and Shelby County have historically permitted consideration of an application's compatibility with the character of the existing neighborhood, and have provided criteria to be considered in determining neighborhood compatibility. *See*, e.g., Memphis and Shelby County Subdivision Regulations § 403.1(D). However, the standard was changed in the new comprehensive UDC. Specifically, UDC Section 3.9.2 provides the minimum "contextual infill development standards" that must be utilized on any applicable residential project. *See* Memphis & Shelby County Unified Dev. Code § 3.9.2(B), discussed in detail, *infra*. The standards set forth in Section 3.9.2 of the UDC "are intended to accommodate the majority of infill development in existing residential neighborhoods," and have "been crafted to allow an applicant (and staff) to look to the surrounding 'context' for guidance in construction." Memphis & Shelby County Unified Dev. Code § 3.9.2(A). Moreover, the standards "are intended to encourage reinvestment in existing neighborhoods and [to] reinforce the traditional character of established residential neighborhoods." ***Id***. To these ends, UDC Section 3.9.2(D) sets out the minimum lot width standard:

The minimum lot width requirement is the smaller of:

_____

[6] Mr. Wills argues that his application is similar to the 2000 approval of the re-subdivision of the two lots across the street from Lot 94. It is important to note, however, that the 2000 re-subdivision of the two opposite lots, Case #S 99-094, was approved under the former Subdivision Regulations, and not under the UDC.

> 1. The average width of the four lots on either side of the project site fronting on the same block face (the two closest lots in either direction along the street); or
>
> 2. The average of the widths for all lots fronting on the same block face.

Memphis & Shelby County Unified Dev. Code § 3.9.2(D).

Appellants contend that the LUCB and City Council's denial of Mr. Wills' application was based upon the fact that his proposal failed to meet the Section 3.9.2 lot width requirement, *supra*. Specifically, Appellants argue that Mr. Wills' proposed subdivision of Lot 94 fails the mathematical formula for minimum lot width as set forth in the foregoing section of the UDC. According to Section 3.9.2, Appellants aver that Mr. Wills' proposed lots must both be at least 117.31 feet wide because the average width of the four closest lots on the same block face as Mr. Wills' lot, i.e., the west side of Belle Meade Lane, is 117.31 feet. This average, as noted by Appellants, is less than the average width of all lots on the same block face as Mr. Wills' lot, i.e., the west side of Belle Meade Lane, which average 126.57 feet of frontage.[7] Mr. Wills' lot is 227 feet wide; his Proposed Lots 94A and 94B are 116 feet wide and 104.98 feet wide, respectively. Appellants note that Mr. Wills did not seek a waiver of the minimum lot width requirement, and instead argued that his application was consistent with the subdivision's R-10 zoning, which required only 60 feet of frontage. Accordingly, Appellants contend that Mr. Wills' proposed lots do not meet the minimum lot width requirements under the UDC standard, which requires greater frontage than the minimum width for R-10 zoned properties. In their presentation to the City Council, the Appellants used a map that depicted the lot widths in the Subdivision to show that Mr. Wills' proposed lots were not in compliance with the average frontage of other relevant properties.

In addition to the lot width requirements, the UDC also provides standards for setbacks. As is relevant here, Section 3.9.2(E) provides:

> Structures shall be located within the range of front setbacks on the street. This range of setbacks is measured on the basis of the four lots surrounding the project site (the two closest lots in

---

[7] As noted by Appellants, Mr. Wills' lot is a corner lot and, thus, there are no lots on the south side fronting on the same block face. The average of 117.31 feet represents the average of the four closest lots on the same block face. The average of just the two closest lots on the north side of Mr. Wills' lot would result in an average width of 124.5 feet. Therefore, Appellants contend that, under any possible calculation, Mr. Wills' proposed Lots 94A and 94B would not meet the minimum average lot width.

-13-

either direction along the street). The new structure shall be located within the range of setbacks (no closer than the narrowest setback, no further than the deepest setback). Where a setback in these four lots is significantly out of the range of setbacks along the street, it may be eliminated from the range. Where the calculation of a range of setbacks is not practicable, the structure shall be located a minimum of 20 feet from the front of the property line.

Appellants argue that neither the OPD, nor Mr. Wills' application addressed the UDC's setback requirements. Mr. Wills' plan, however, provides for a 30-foot front setback, which Appellants contend would not be permissible under the compatibility setback requirements for in the contextual infill standards of the UDC. Relying on the plat map for Belle Meade Subdivision, Appellants aver that the plat reflects that all lots on the west side of Belle Meade Lane (other than Lot 94) have setbacks greater than 30 feet, which was consistent with the setback of the other lots on that block face. Therefore, Appellants contend that the trial court's finding that Mr. Wills' application complies with all provisions of the UDC, *see* discussion *infra*, was erroneous.

On the other hand, Mr. Wills contends that the LUCB was required to approve his application because it met the criteria set out in UDC Section 9.7.7. He further notes that the LUCB's written recommendation, which summarizes the proceedings before the LUCB, contains no indication that the LUCB even considered UDC Section 3.9.2 in addressing Mr. Wills' application. Specifically, he states that the LUCB recommendation fails to mention: (1) the applicability criteria set out at UDC Section 3.9.2(B), or whether these criteria apply to Mr. Wills' application; (2) any discussion or calculation of the "minimum lot width requirement" set forth at UDC 3.9.2(D); (3) any discussion or calculation of the "range of front setbacks" as set forth in UDC Section 3.9.2(E); or (4) any discussion of any of the other contextual infill standards set forth in UDC Section 3.9.2. In fact, Mr. Wills correctly points out that the LUCB's recommendation does not mention UDC Section 3.9.2 at all. He notes that UDC Section 3.9.2 requirements were not specifically raised by the Appellants until they filed their trial brief. According to Mr. Wills, it was only then that the Appellants claimed that Mr. Wills' application failed to comply with the infill standards of UDC 3.9.2. In short, Mr. Wills argues that the LUCB recommendation, and the lack of any specific reference to UDC Section 3.9.2, indicates that the LUCB erroneously based its recommendation on the old Subdivision Regulations, which were not applicable following enactment of the UDC. Specifically, Mr. Wills contends that the "LUCB recommendation indicates that the LUCB ignored that the zoning law had changed significantly from the prior zoning law which 'historically permitted evaluation of an application's compatibility with the character of the existing neighborhood.'"

Despite the absence of any reference to UDC Section 3.9.2, the Appellants contend that the LUCB and the City Council did "silently consider Section 3.9.2" in reaching the decision to deny Mr. Wills' application. To support this argument, the Appellants point out that the arguments to the City Council concerned the "character of the neighborhood," which directly implicates UDC Section 3.9.2, regardless of whether that Section number was actually cited. In addition, the Appellants argue that it was not their burden to show that Mr. Wills' proposed subdivision did not comply with UDC Section 3.9.2, but that it was Mr. Wills' burden to show that it did. *See* UDC 9.3.3(E)(2) (noting that an application may only be approved if it "contains all of the information necessary to decide whether or not the development as proposed will comply with all of the requirements of this development code"); *see also* Memphis & Shelby County Unified Dev. Code § 9.7.7(C)(1) (requiring that an application for a major preliminary plan comply with UDC Section 9.3.3); *c.f. **Abbington Center, LLC v. Town of Collierville***, 393 S.W.3d 170 (Tenn. Ct. App. 2012) (emphasizing that the applicant has the burden of proof to show that his or her proposal conforms to applicable ordinances). Finally, the Appellants point out that both this Court and the trial court are constrained by the applicable standard of review to only consider whether any material evidence in the record supports the local agency's decision. *See **Davis***, 278 S.W.3d at 262. Because the evidence in the record indicates that the proposed subdivision does not comply with UDC Section 3.9.2, the Appellants urge this Court to consider the requirements of UDC Section 3.9.2 despite the fact that the provision was not specifically cited by the LUCB or the City Council.

The record in this case does little to facilitate appellate review on this issue. Here, both parties set forth waiver arguments regarding the use of the UDC in this case. While evidence regarding the subject matter of UDC Section 3.9.2 is clearly contained in the record, neither the City Council, nor the LUCB specifically reference the UDC in their decisions. We note that the City Council, unlike a trial court, is not required to make findings of fact and conclusions of law to support its decisions. *See **Moore v. Metropolitan Bd. of Zoning Appeals***, 205 S.W.3d 429 (Tenn. Ct. App. 2006) (holding that a local agency is not required to make findings of fact and conclusions of law in order to withstand writ of certiorari review). Under these circumstances, we decline to conclude that consideration of the applicability of the UDC was waived by either party. Accordingly, we go on to consider whether the UDC provided an appropriate basis for the denial of Mr. Wills' subdivision application.

Before specifically addressing the issues concerning the nature and weight of the evidence adduced in the hearings on Mr. Wills' proposal, it is necessary to understand the requirements for approval of the subdivision of Lot 94 under the UDC in order to determine what provisions of the UDC are applicable in this case. This inquiry requires a close reading of the UDC.

In ***Brunetti v. Board of Zoning Appeals of Williamson County***, this Court discussed our role in evaluating and interpretation zoning ordinances. We find the language equally applicable to interpretation of the UDC:

> The interpretation of a zoning ordinance and its application to a particular set of facts are, in the first instance, questions for decision by local officials. Courts are hesitant to interfere with decisions by local [] officials unless clearly necessary and will not substitute their judgment for that of the local zoning officials. *See* ***Hoover*** [***v. Metro. Bd. of Zoning Appeals of Davidson Cnty.***], 955 S.W.2d [52,] at 54 [Tenn. Ct. App. 1997] (citing ***McCallen*** [***McCallen v. City of Memphis***, 786 S.W.2d 633,] 639 [(Tenn. 1990)]; ***Whittemore v. Brentwood Planning Comm'n.***, 835 S.W.2d 11, 15 (Tenn. [Ct.] App.1992). However, while courts may defer to local officials' interpretations where the interpretation is fairly debatable and the ordinance is ambiguous, they will set aside an interpretation which is arbitrary and capricious, contrary to the drafters' intent, or which undermines the ordinance's validity. ***Whittemore***, 835 S.W.2d at 16.
>
> We interpret these and other relevant authorities to mean that our role is not to provide the initial interpretation of the Ordinance . . . . If the Ordinance may reasonably be interpreted more than one way, we will not substitute our judgment of the more preferable interpretation as long as the board's choice has a reasoned basis.

***Brunetti v. Bd. of Zoning Appeals of Williamson Cnty.***, No. 01A01-9803-CV-00120, 1999 WL 802725 (Tenn. Ct. App. Oct. 7, 1999). When the language of an ordinance is clear, courts will enforce the ordinance as written; when the language of an ordinance is ambiguous, however, courts will resort to principles of statutory construction. ***421 Corp. v. Metro. Gov't of Nashville & Davidson Cnty.***, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000).

With the foregoing principles in mind, we turn to the UDC. The introductory section of the UDC is entitled "How to Use this Code." Under this section, the property owner is directed to various portions of the UDC depending on what action the property owner is pursuing. For example, if the property owner wants "[t]o modify a building or develop a new building," he or she is instructed, *inter alia*, to "[g]o to Article 3, Building Envelope Standards, for your specific district to review the dimensional standards that apply to your property." UDC Section 3.9 is titled "Residential Compatibility," and the disputed

"Contextual Infill Standards" are contained in UDC Section 3.9.2. As is relevant to the instant case, where the property owner wants "[t]o subdivide my property," the introductory section of the UDC cautioned that "[p]roperty can only be subdivided in accordance with the procedures in Chapter 9.7, Subdivision Review."

As noted above, Mr. Wills' subdivision application was deemed a "major preliminary plan," as opposed to a "minor preliminary plan." The distinction is important insofar as the application requirements are concerned. A "minor preliminary plan" is given expedited procedure for approval, which "is intended to simplify processing of routine small subdivisions with regard to protection of the public interest." Memphis & Shelby County Unified Development Code 9.7.6(A). UDC Section 9.7.6(G) sets out the "Approval Criteria" for minor preliminary plans; these criteria include the requirement that "[t]he plan complies with the standards of Article 3, Building Envelope Standards . . . ." Thus, the criteria for minor preliminary plans requires that the plan complies with Article 3 of the UDC, which includes UDC Section 3.9.2 regarding contextual infill standards. However, after reading Chapter 9.7 of the UDC in its entirety, we do not find any language therein that specifically requires major preliminary plans, such as Mr. Wills', to comport with UDC Article 3, including the Section 3.9.2. contextual infill requirements. Rather, the approval criteria for major preliminary plans are enumerated in UDC Section 9.7.7(H) as follows:

> A major preliminary plan shall be approved by the Land Use Control Board if it meets the following criteria:
>
> 1. Conforms with all of the provisions and requirements of any plans to be considered (*See* Chapter 1.9);
>
> 2. There are adequate public facilities available, to be provided by the applicant or programmed within the five-year capital improvements program of the government bodies to accommodate the proposed development;
>
> **3.** Conforms with all of the applicable provisions of this development code; and
>
> 4. Conforms with all the provisions and requirements of other applicable codes and ordinances relating to land development not included in this development code.

This section broadly requires that the major preliminary plan "[c]onform[] with all provisions and requirements of any plans to be considered (see Chapter 1.9 [Chapter 1.9 contains a list

-17-

of more City-wide developments, such as the "Shelby County Greenway Plan," and "Victorian Village Redevelopment Plan," which are not specifically applicable to Mr. Wills' application])." Concerning criterion 2, i.e., that "adequate public facilities" are available, there appears to be no dispute in the record that this requirement is met. Accordingly, criteria 3 and 4 are the dispositive requirements in Mr. Wills' case. Criterion 3 requires that the major preliminary plan "[c]onform[] with all the **applicable** provisions and requirements of the [UDC]." Memphis & Shelby County Unified Development Code 9.7.7(H) (emphasis added). As discussed above, the thrust of Appellants' argument is that Mr. Wills' property does not comport with Section 3.9.2 of the UDC in terms of frontage and setback requirements. This argument begs the initial question of whether Section 3.9.2 of the UDC is "applicable" to Mr. Wills' proposal to subdivide his lot (as set out above, criterion 3 of UDC Section 9.7.7(H) requires the plan to conform with **applicable** sections of the code).

We conclude that UDC Section 3.9.2 is applicable to both minor preliminary plans and major preliminary plans for subdivision. UDC Section 3.1.2 specifically requires that: "All subdivision shall occur in conformance with this Article [i.e., Article 3] as set forth in Chapter 9.7, Subdivision Review." This Court has held that: "The well-known *in pari materia* rules also apply to the construction of zoning ordinances. Thus, zoning ordinances dealing with the same subject should be construed together." *421 Corp. v. Metropolitan Government of Nashville and Davidson County*, 36 S.W.3d 469, 475 (Tenn. Ct. App. 2000) (citing *Lions Head Homeowners' Ass'n v. Metropolitan Bd. of Zoning Appeals*, 968 S.W.2d 296, 301 (Tenn. Ct. App. 1997)). Accordingly, all subdivision plans, including major preliminary plans, must comply with all applicable provisions of Article 3, including UDC Section 3.9.2.

Mr. Wills argues, however, that even if the UDC is applicable to a major preliminary plan to subdivide property under Chapter 9.7, UDC Section 3.9.2 does not apply to the specific property at issue in this case. To support this argument, Mr. Wills points to UDC Section 3.9.2(B)(1), the provision that specifically outlines the applicability of UDC Section 3.9.2.'s contextual infill standards. UDC Section 3.9.2(B) states:

> **B. Applicability**
>
> 1. The contextual infill development standards shall be used on any residential project that is less than two acres in size and is surrounded on all sides by existing single-family detached or single-family attached development legally established before 1950 in a residential district.
> 2. Residential projects two acres or more in size shall follow the applicable district standards (see Chapter 3.6, 3.7, or 3.8).

-18-

3. These contextual infill standards may not be used for nonresidential development in residential districts.

Mr. Wills argues that his property is not "surrounded on all sides by existing single- family detached or single- family attached development legally established before 1950 in a residential district" and that, therefore, the contextual infill standards are not applicable to bar his proposed subdivision. According to Mr. Wills, the Appellants concede in their brief that this is the only section of the UDC that may bar Mr. Wills proposed subdivision. Indeed, from our review of the Appellants' brief, they state: "Significantly, there is only one section of the UDC that provides the compatibility standards; and thus, any consideration of whether Petitioner's proposal meets the 'character of the neighborhood' requirements must be made pursuant to that section [i.e., UDC Section 3.9.2]." Further, nothing in the Appellants' brief indicates any other provisions of the applicable zoning ordinances or the UDC which are violated by the proposed subdivision of Lot 94. Accordingly, because UDC 3.9.2 is the only section alleged by the Appellants to be violated by Mr. Wills' proposed subdivision, the question of the applicability of UDC Section 3.9.2 is the central question in this appeal.

Before we address the applicability of UDC Section 3.9.2, we first note that Appellants argue on appeal that regardless of the UDC Section 3.9.2's applicability to Lot 94, the decision of the City Council should not be reversed for using the contextual infill standards to deny Mr. Wills' subdivision application. Specifically, the Appellants argue that: (1) the City Council had discretion to apply UDC Section 3.9.2 to Mr. Wills' proposal regardless of whether the UDC provides that it is applicable to Lot 94; and (2) assuming that the contextual infill standards are not applicable to Mr. Wills' project, the City Council's misapplication of UDC Section 3.9.2 to Mr. Wills' proposal is not sufficient to justify reversal of the City Council's decision. We consider each of these arguments in turn.

Appellants first argue that regardless of whether UDC Section 3.9.2 must be applied to Mr. Wills' property, the "language [in UDC Section 3.9.2] does not prohibit discretionary application of the infill development standards where this criteria is not met." We respectfully disagree. As previously discussed, in construing the language of an ordinance, we use the familiar rules of statutory construction. *Garrett v. City of Memphis*, 327 S.W.3d 37, 40 (Tenn. Ct. App. 2010) (citing *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn. 2000) ("The rules of statutory interpretation are used when interpreting an ordinance.")). According to this Court:

> Our principal goal in statutory construction is to give effect to the intent of the legislature. *Hawks v. City of Westmoreland*, 960 S.W.2d 10, 16 (Tenn.1997). "Legislative intent or purpose is to be ascertained primarily from the natural and ordinary

meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language." ***Carson Creek Vacation Resorts, Inc. v. State, Dep't of Revenue***, 865 S.W.2d 1, 2 (Tenn.1993) (citation omitted). It is not within the province of the courts to alter or amend a statute. ***Gleaves***, 15 S.W.3d at 803 (Tenn.2000) (citations omitted). Similarly, the judiciary should not substitute its own policy judgment for that of the legislature. ***Id.*** (citation omitted). It is our duty to interpret and enforce the enactment as written. ***Id.*** (citation omitted).

*Garrett*, 327 S.W.3d at 40.

In this case, the UDC specifically provides that the contextual infill standards contained in UDC Section 3.9.2 "shall" apply to all residential projects that are "less than two acres in size and [] surrounded on all sides by existing single-family detached or single-family attached development legally established before 1950 in a residential district." UDC Section 3.9.2 goes on to specifically address property where the contextual infill standards shall not be applied. *See* Memphis & Shelby County Unified Dev. Code § 3.9.2(B)(2–3). The Tennessee Supreme Court has expressed approval for the statutory construction canon "*expressio unius est exclusio alterius*," an expression that means "to mention one thing is to exclude others." *See **In re Estate of Davis***, 308 S.W.3d 832, 841 (Tenn. 2010) (citing ***Overstreet v. TRW Commercial Steering Div.***, 256 S.W.3d 626, 633 (Tenn. 2008), abrogated on other grounds, ***Hayes v. Am. Zurich Ins. Co.***, No. E2010-00099-WC-R3-WC, 2011 WL 2039402, at *6 (Tenn. Workers Comp. Panel, May 25, 2011) (citing Tenn. Code Ann. § 50-6-204(a)(1–2)); *see also **Calaway v. Schucker***, 193 S.W.3d 509, 516 (Tenn.2006); ***Etheridge ex rel. Etheridge v. YMCA of Jackson***, 391 S.W.3d 541, 547 (Tenn. Ct. App. 2012). Here, the UDC contains a very specific provision regarding the applicability of the contextual infill standards. *See* Memphis & Shelby County Unified Dev. Code § 12.1(D) (noting that the use of the word "shall" in the UDC indicates that the requirement is mandatory, rather than permissive). Nothing in UDC Section 3.9.2, however, indicates that the local agency may apply the contextual infill standards to a project, notwithstanding the project's failure to fall within the stated bounds of applicability. Under these circumstances, we decline to conclude that City Council may apply the contextual infill standards if the residential project does not fall without the express bounds of UDC Section 3.9.2(B)(1).

The Appellants next argue that even if the City Council improperly applied the provisions of UDC Section 3.9.2 to Lot 94, such mistake is insufficient to overturn the City Council's decision. To support this argument, the Appellants cite the Tennessee Supreme

Court's Opinion in *Yokley v. State*, 632 S.W.2d 123 (Tenn. Ct. App. 1981). In *Yokely*, the Tennessee Court of Appeals indicated that a writ of *certiorari* may only be used " to ascertain the validity of proceedings before a court of justice, either on the charge of their invalidity, because the essential forms of law have not been observed, or on that of the want of jurisdiction in the court entertaining them." *Id.* at 126 (quoting *State ex rel. McMorrow v. Hunt*, 137 Tenn. 243, 192 S.W. 931, 932 (1917)). The Court explained that in reviewing a decision in a writ of *certiorari*, the court could not "inquire into the correctness of the judgment" so long as the judgment was "rendered where the court had jurisdiction."*Yokley*, 632 S.W.2d at 126 (quoting *Hunt*, 192 S.W. at 932). Based on this language, the Court concluded that "an error of law is not 'an illegal decision.' Nor is it an arbitrary or capricious one." *Yokley*, 632 S.W.2d at 126.

The scope of review in a common law writ of certiorari, however, is not so limited as to require us to affirm a decision based upon a misapplication of the law. As previously discussed, the Tennessee Supreme Court recently held that in order to determine whether a decision by a local agency is "illegal, arbitrary, or fraudulent," the reviewing court should consider whether there was a "misrepresentation or misapplication of legal standards." *Harding Academy,* 222 S.W.3d at 363. Thus, if the City Council improperly applied UDC Section 3.9.2 to Mr. Wills' proposed subdivision, that decision would be "illegal, arbitrary, or fraudulent," for purposes of a writ of *certiorari*. Accordingly, a determination of whether UDC Section 3.9.2 is applicable to Mr. Wills' proposed subdivision is necessary to the determination of this case. We turn to address that issue.

With regard to the applicability standards expressly contained in UDC Section 3.9.2(B), Mr. Wills' proposed subdivision undisputedly involves a residential project and is less than two acres in size. There is considerable dispute, however, as to whether the project is "surrounded on all sides by existing single- family detached or single- family attached development legally established before 1950 in a residential district." Memphis & Shelby County Unified Dev. Code § 3.9.2(B)(1). On the one hand, Appellants argue that the term "development" refers to other subdivisions surrounding the *Belle Meade* subdivision. They argue that UDC Section 3.9.2 is applicable because Mr. Wills' property is surrounded: (a) on the north side and the east side by Belle Meade subdivision, an existing single-family detached "development" legally established in 1947; (b) on the south side by The Village Subdivision, an existing single-family detached "development" legally established in 1938; and (c) on the west side by the Tuckahoe Subdivision, an existing single-family detached "development" legally established in 1938. Thus, Appellants argue that UDC Section 3.9.2 is properly applicable to Mr. Wills' property.

In contrast, Mr. Wills argues that the term "development" is ambiguous and should be defined to mean the lots surrounding the lot at issue. To support this argument, Mr. Wills

cites a Staff Report of the OPD prepared on April 12, 2012 ("Staff Report"), which details plans to amend the UDC in the future. With regard to UDC Section 3.9.2, the Staff Report proposes:

3.9.2 - **Infill Standards –** *Housekeeping*
Two amendments are being considered for this section that deals with infill residential development. These are located in Paragraph **3.9.2B(I)** and Sub-Section **3.9.2J.** A clarification is made regarding the conditions that trigger contextual infill development standards, these standards are triggered when a lot is abutted on two or more sides, not when entirely surrounded. A cross-reference to the building height section of the UDC (Sub-Section 3.2.6A) has been provided to determine foundation height. Sub-Section 3.9.217 is revised to permit rear yard encroachments in addition to side yard encroachments.

(Emphasis added). Although the UDC was not amended to reflect this change until 2012, Mr. Wills argues that this change is evidence of the existing interpretation of the word "development" in UDC Section 3.9.2(B)(1). See *In re Estate of Jenkins*, 8 S.W.3d 277 (Tenn. Ct. App. 1999) (holding that where a statute is ambiguous, the court may look to the legislative history of an enactment, including any subsequent amendments). Thus, Mr. Wills argues that the Staff Report evidences the OPD's interpretation of the term "development" in UDC Section 3.9.2 to mean "lots" rather than larger subdivisions.

Although not cited by either party in their brief to this Court, the UDC expressly defines the term "development." According to UDC Chapter 12.3: "For the purpose of this development code, certain numbers, terms, and words used shall be used, interpreted, and defined as set forth below." Thus, we are constrained to follow the definition of "development" expressly provided in the UDC. Pursuant to UDC Section 12.3.1, "development" is defined as: "Any man-made change defined as the construction of buildings or other structures, mining, dredging, paving, filling, grading or site clearing, and grubbing in amounts greater than ten cubic yards on any lot or excavation." Accordingly, the UDC definition defines "development" as a "man-made change . . . on any *lot* or excavation." *See also* Memphis & Shelby County Unified Dev. Code § 12.3.1 (defining a "lot" as, *inter alia*, "[a] parcel or tract of land that is recorded in the Shelby County Register's Office that is part of a subdivision and designated on the subdivision plat as a lot"). Based on the above definition, the UDC definition appears to support Mr. Wills' argument that a development could mean a change in a single lot. However, the resolution of this issue is far from clear; while the UDC definition clearly indicates that a development involves the construction of "buildings" and "structures" on a "lot", the UDC makes clear that "[w]ords in the singular number include the plural number and words in the plural number include the singular number." Memphis & Shelby County Unified Dev. Code § 12.1(B). Thus, the definition of "development" is not determinative of whether the term

contemplates a single structure on a single lot or multiple structures on multiple lots. Consequently, the definition of "development" provided by the UDC does little to resolve this dispute.

The Appellants essentially argue that the term "development" is synonymous with the term "subdivision," and that it must mean more than a single lot. The term "subdivision," however, is not defined by the UDC. According to the UDC, where a term is not expressly defined by ordinance, it "shall be interpreted in accord with their usual dictionary meaning and customary usage." Memphis & Shelby County Unified Dev. Code § 12.1(M). *Black's Law Dictionary* defines a "subdivision" as "[a] parcel of land in a larger development." *Black's Law Dictionary* 1560 (9th ed. 2009). *Black's Law Dictionary* defines "development" only as "[a] substantial human-created change to improved or unimproved real estate, including the construction of buildings or other structures." Thus, the dictionary definitions of "subdivision" and "development" indicate that a subdivision, which by definition contains multiple parcels (or lots, as defined by the UDC, discussed *supra*) is contained within a "development," implying that the term "development" cannot be defined as a single lot.

Under these circumstances, we conclude that UDC Section 3.9.2(B)(1) is ambiguous as to what type of "development" must surround a residential project in order for the UDC's contextual infill standards to apply. Based upon Mr. Wills' interpretation of the term "development" as only a single lot, he argues that the contextual infill standards do not apply because his lot is not surrounded on all sides by developments established prior to 1950. In contrast, based on the Appellant's interpretation of the term, they argue that Mr. Wills' property is surrounded on all sides by developments established prior to 1950. The resolution of this ambiguity is necessary to determine whether the City Council "misappli[ed] [] legal standards" in denying Mr. Wills' subdivision application. *See Harding Academy,* 222 S.W.3d at 363. Mr. Wills urges this Court to resolve the ambiguity in his favor and conclude that UDC Section 3.9.2 is not applicable to the subdivision of Lot 94.

The City argues, however, that "any question regarding the applicability of the infill development standards should be determined, in the first instance, by 'the community decision-makers closest to the events, who have been given broad powers in the area, to make zoning and land use decisions.'" *See Wadlyn Corp. v. City of Knoxville*, 296 S.W.3d 536, 544 (Tenn. Ct. App. 2008). Indeed, this Court has previously held that while questions of law are generally reviewed with no presumption of correctness, courts are required to afford deference and controlling weight to an agency's interpretation of its own rules and regulations. *Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002) (citing *Profill Dev., Inc. v.. Dills*, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997). Indeed, in *Profill Dev., Inc. v. Dills*, 960 S.W.2d 17, 27 (Tenn. Ct. App. 1997), a case involving the

Tennessee Department of Environment and Conservation ("TDEC"), this Court held that:

> [TDEC] has the knowledge, expertise and experience and is charged with the administration of the technical details of the statute. Accordingly, [TDEC's] decisions concerning the applicability of technical terms of the statute are entitled to deference in the same manner as other technical decisions. ***Wayne County v. Solid Waste Disposal Control Board***, 756 S.W.2d 274, 279–280 (Tenn. Ct. App.1988).

*Id.* at 27. The question in this case likewise involves "the applicability of technical terms" in an ordinance. *Id.* Although the decision in *Dills* involved the decision of a State agency under the UAPA, this Court has held that similar deference should be accorded to a local agency's "interpretation of [a] zoning ordinance." ***Advanced Sales, Inc. v. Wilson County***, No. 01-A-01-9805-CH00245, 1999 WL 336305, at *4 (Tenn. Ct. App. May 28, 1999) ("This case involves an interpretation of the zoning ordinance, a matter in which the Board's expertise is entitled to great deference.") (citing ***C.F. Industries v. Tenn. Pub. Serv. Comm.***, 599 S.W.2d 536, (Tenn. 1980)). Further, in ***Hoover, Inc. v. Metropolitan Board of Zoning Appeals for Davidson County***, 955 S.W.2d 52 (Tenn. Ct. App. 1997), we stated:

> The common-law writ of certiorari is a supervisory writ, that provides the courts with limited options for dealing with error discovered in the proceedings being reviewed. Because courts should avoid requiring local zoning authorities to take a particular action except in the most extraordinary circumstances, the most common judicial remedy in zoning cases is to remand the case to the zoning agency with instructions appropriate to the circumstances of the case. Rather than shouldering the local agency's responsibilities, the courts should insist that the agency carry out its task in an appropriate manner. The goal of a remand should be to place the parties and the agency in the position they would have been in had the agency not acted improperly.

***Hoover***, 955 S.W.2d at 55 (citations omitted). Thus, remand to the City Council is appropriate to resolve this dispute.

Nothing in the record indicates that the City Council actually considered and resolved the issue of the interpretation of the term "development" in UDC Section 3.9.2. However, the resolution of that issue is necessary to the determination of whether the City Council acted illegally in denying Mr. Wills' subdivision application. Instead of considering this

issue, the trial court based its determination that the LUCB and the City Council erred in denying Mr. Wills' petition upon a finding that the decision was arbitrary and capricious. This finding was predicated upon the trial court's conclusion that the evidence of neighbors' concerns was not material to the inquiry of compliance with the UDC. As previously discussed, however, the Appellants contend that the evidence went beyond mere conjecture in that they provided plat maps and evidence showing that the proposed lots did not comply with UDC Section 3.9.2's infill requirements. Further, the trial court specifically held "that [Mr. Wills'] application complies with all provisions of the . . . UDC." Without a determination as to the applicability of UDC Section 3.9.2, that holding was in error.  As we have determined that consideration of the UDC was not waived by either party, there remains a material dispute as to whether UDC Section 3.9.2 is applicable to the residential project at issue. Further, because this issue involves the proper interpretation of a zoning ordinance, as well as specific factual findings regarding the properties surrounding Lot 94, it should be decided, in the first instance, by the City Council. Consquently, we vacate the judgment of the trial court finding that Mr. Will's "application complies with all provisions of the . . . UDC" and remand this matter to the trial court, with instructions to remand to the City Council to determine the proper interpretation to be given to  UDC Section 3.9.2(B)(1). If Lot 94 is determined to be "surrounded on all sides by existing single-family detached or single-family attached development legally established before 1950 in a residential district" the City Council may then consider whether Mr. Wills' proposed subdivision complies with the contextual infill standards. If, however, Lot 94 is found not to be "surrounded on all sides by existing single-family detached or single-family attached development legally established before 1950 in a residential district," the City Council is directed to grant Mr. Will's application for subdivision of Lot 94.

Our analysis to this point adjudicates all of the Appellants' issues except for the last, i.e., "[w]hether the trial court's remand instructions erroneously prohibit the Memphis City Council from considering any additional evidence on the issue of whether [Mr. Wills'] application fails to comply with the UDC."  As set out in its October 18, 2013 amendment, the trial court held, in relevant part, that:

> 3. Upon remand, the Memphis City Council shall not consider any additional evidence from any party or person that [Mr. Wills'] application fails to comply with the UDC.
> 4. Upon remand, the Memphis City Council may not consider any additional evidence from any parties or persons beyond the record at the time of the hearing before the Memphis City Council on August 16, 2011.

Here, the Appellants appear to infer from the trial court's order that the City Council may

not, on remand, consider the issue of whether the UDC prohibits the subdivision of Lot 94. We disagree. From our review of the trial court's order, the trial court merely ordered that the City Council may not consider additional "evidence" regarding the applicability of the UDC, rather than additional argument. Moreover, our holding herein has specifically mandated that the City Council consider this issue.

Thus, we interpret the trial court's order only as prohibiting the Appellants from submitting additional evidence, not contained in the record, regarding the applicability of the UDC. We find no error in the trial court's prohibition. This Court in **Hoover** held that with regard to a decision by a local agency, "the most appropriate remedy is to remand the case to the Board with directions to conduct a new hearing based on the existing record **without introduction of additional factual evidence**." **Hoover**, 955 S.W.2d at 55 (emphasis added). "Reopening the record at this late stage would only give the parties a second bite at the apple." **Id**. Thus, the trial court's mandates clearly comply with our decision in **Hoover**, and we cannot assign error to its directions.Further, our determination that Lot 94's compliance with the UDC was not waived is based, in part, on the Appellants' argument that the record already contains sufficient evidence that the proposed subdivision of Lot 94 does not comply with UDC Section 3.9.2. Accordingly, if the City Council determines that the contextual infill standards are applicable to Mr. Wills' proposed subdivision, based upon the Appellants' own arguments, there is sufficient evidence in the record to determine whether UDC Section 3.9.2 prohibits the proposed subdivision without the need to present additional evidence.

Finally, Mr. Wills has asked this Court to award his attorney's fees and costs for the appeal. However, Mr. Wills has not set forth a legal argument regarding why he may be entitled to such relief. An award of appellate attorney's fees is a matter within this Court's sound discretion. **Archer v. Archer**, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). Exercising that discretion, we respectfully decline to award Appellee attorney's fees on appeal.

For the foregoing reasons, we affirm in part, and vacate in part the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed one-half to the Appellants, The City of Memphis and the Memphis City Council, and their surety, and one-half to the Appellee, John R. Wills, for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE