# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 10, 2018 Session

## CHARLES MICHAEL KINCADE v. AMANDA WOOLDRIDGE KINCADE

**Appeal from the Chancery Court for Williamson County**
**No. 44756     Joseph A. Woodruff, Chancellor**

_____

### No. M2017-00797-COA-R3-CV

_____

This appeal arises from a divorce; the primary issues on appeal pertain to the permanent parenting plan. During the pendency of the divorce and following a successful mediation, the parties entered into a Marital Dissolution Agreement and a Permanent Parenting Plan. Six weeks later, Father filed a notice of withdrawal of his consent to the mediated parenting plan. Subsequently, an order was entered approving the Marital Dissolution Agreement and declaring the parties divorced, reserving the issue of a permanent parenting plan for trial. Following the trial, the court established a permanent parenting plan similar to the mediated plan with four modifications. When Mother's counsel submitted the final order for the court's approval, it contained three alternatives for the "right-of-first-refusal" provision, which was one of the four modifications. The trial court approved one of the "right-of-first-refusal" alternatives and entered the final order. Father appeals, arguing the trial court abused its discretion in its formulation of the parenting plan and in awarding Mother her attorney's fees. Finding no abuse of discretion, we affirm. We also award Mother the reasonable and necessary attorney's fees she incurred on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which RICHARD R. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Robbie T. Beal and Erin W. Nations, Franklin, Tennessee, for the appellant, Charles Michael Kincade.

James H. Drescher, Brentwood, Tennessee, for the appellee, Amanda Wooldridge Kincade.

# OPINION

Charles Michael Kincade ("Father") and Amanda Wooldridge Kincade ("Mother") married on September 17, 2008. Elijah, the parties' only son, was born in November 2010. Husband filed for divorce on December 10, 2015. Following successful mediation on July 19, 2016, the parties agreed to a Martial Dissolution Agreement ("MDA") and a Permanent Parenting Plan ("Agreed PPP") pursuant to which Mother was designated as the primary residential parent with her receiving 225 days with Elijah and Father receiving 140 days.

The following day, Father began taking steps to repudiate the Agreed PPP, which we address in more detail below. On September 1, 2016, Father filed a Notice to withdraw his consent to enter the Agreed PPP because he no longer believed the plan was in the child's best interests nor workable due to "Mother's actions and omissions." The parties then agreed to a temporary parenting plan, which provided equal parenting time, and on December 19, 2016, the trial court entered a Final Decree of Divorce.

On March 10, 2017, the trial court conducted an evidentiary hearing to adjudicate the issue of the permanent parenting plan. On March 17, 2017, the trial court entered an Order and Memorandum adopting the Agreed PPP with the following four modifications:

1. Item B shall be amended to provide the time by which Father shall return Elijah to Mother on Monday is changed from 9:00 p.m. to 8:00 p.m.

2. A right-of-first-refusal provision, consistent with item J of Trial Exhibit 1, shall be included providing each parent with the right to have parenting time with Elijah on those dates otherwise scheduled for the opposite parent. This right of first refusal shall not be construed to give Father the right to undertake the regularly scheduled pick up from school currently being handled by Mother with her retained babysitter.

3. Item C shall be amended to provide July 4th shall be shared by the parties on an even/odd schedule with Mother having the even numbered years and Father having the odd numbered years.

4. Item C shall be further amended to provide Father with parenting time on every annual observance of Father's Day and each parent exercising residential parenting time on their respective birthdays.

The court also awarded Mother her attorney's fees and expenses. Furthermore, the order instructed counsel for Mother to "prepare, file, and serve proposed Permanent Parenting Plan, using the approved form, containing the terms and conditions of Trial Exhibit 4 as modified by this Memorandum and Order."

On April 3, 2017, Mother filed a Notice of Filing which proposed three different parenting plans that were identical in all respects but one, the "right-of-first-refusal" provision. One version had no right-of-first-refusal, another was an alternate version Mother recommended, and the third, which was identical to the Agreed PPP, read:

1. Should either parent have to be away from the child for a period of more than six hours during his allotted parenting time, he shall offer the first right of refusal to the other parent to care for the child during that time.

In her filing, Mother argued the "right-of-first-refusal" provision was unwarranted; however, if the court deemed a right-of-first-refusal appropriate, she urged the court to adopt the following version:

In the event either party, during his or her parenting time, is going to be away from the minor child for twelve (12) or more consecutive hours, he or she shall notify the other parent seven (7) days in advance to offer said parent the opportunity to have parenting time in lieu of hiring or using a third party child care provider. The parent being afforded this opportunity to have additional parenting time shall respond, one way or the other, within twelve (12) hours of receipt of the notice.

Mother argued that this provision solved two potential problems with the original provision: (1) it did not provide advance notice to the parties and (2) the six hour absence would trigger the provision every day Mother worked.

On April 10, 2017, the trial court adopted Mother's proposed Permanent Parenting Plan with the following hand-written modification immediately below the "right-of-first-refusal" provision:

*The right of first refusal set out in item J.2. shall* <u>*NOT*</u> *be construed to apply to circumstances where (1) the residential parent is absent due to routine work, (2) where child is in school or on school-related trips, or where child and residential parent are together traveling out of the local area.*

Father appealed.

### ISSUES

The parties present a total of seven issues for our consideration. We have consolidated and rephrased the issues to read as follows:

I. Whether the trial court abused its discretion by failing to maximize Father's participation in the life of his child.

II. Whether the trial court abused its discretion by failing to give Father his requested right-of-first-refusal and by modifying this provision without notice to the parties.

III. Whether the trial court abused its discretion by granting Mother her attorney's fees and expenses.

IV. Whether Father's appeal is frivolous and whether Mother is entitled to recover her legal fees and expenses incurred in this appeal.

**STANDARD OF REVIEW**

"[T]rial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans." *C.W.H. v. L.A.S.*, No. E2015-01498-SC-R11-JV, __ S.W.3d __, 2017 WL 6462395, at *4 (Tenn. Dec. 19, 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)). "[D]etermining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Id*. (citing *Armbrister*, 414 S.W.3d at 693; quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). This court is to employ "a limited scope of review . . . in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *Id*. (citing *Armbrister*, 414 S.W.3d at 692-93) (stating that the appropriate standard of "review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise").

On appeal, we review a trial court's decision regarding parenting schedules for an abuse of discretion. *Id*. (citing *Armbrister*, 414 S.W.3d at 693). The abuse of discretion standard does not permit reviewing courts to substitute their discretion for that of the trial court. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Nevertheless, the abuse of discretion standard of review does not immunize a lower court's decision from any meaningful appellate scrutiny. *Id*.

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

. . .

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Id*. at 524-25 (internal citations omitted).

Therefore, we shall review the trial court's decision regarding the parties' parenting plan to determine, where applicable, whether there is a factual basis for the decision, whether the court properly identified and applied the relevant legal principles, and whether the decision is within the range of acceptable alternative dispositions. *Id*. at 524.

In non-jury cases, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Armbrister*, 414 S.W.3d at 692. However, a trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Armbrister*, 414 S.W.3d at 692.

**ANALYSIS**

### I. MAXIMIZING FATHER'S PARENTING TIME

"Any final decree or decree of modification in an action for absolute divorce . . . involving a minor child shall incorporate a permanent parenting plan. . . ." Tenn. Code Ann. § 36-6-404(a). A permanent parenting plan consists of a "written plan for the parenting and best interest of the child, including the allocation of parenting responsibilities and the establishment of a residential schedule. . . ." Tenn. Code Ann. § 36-6-402(3). A residential schedule explains, *inter alia*, "when the child is in each parent's physical care" and which parent is designated as the primary residential parent. Tenn. Code Ann. § 36-6-402(5).

The trial court is to consider several statutory factors, as it deems relevant, in determining the residential schedule and who should be the primary residential parent. Tenn. Code Ann. § 36-6-106(a). Those factors include the following:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential

- 6 -

protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a)(1)-(15).

Here, the trial court established a Permanent Parenting Plan that was similar to the Agreed PPP with four modifications. In the final parenting plan, Mother was designated as the primary residential parent and received 225 days with Elijah, while Father received 140 days. In coming to its determination, the trial court correctly identified the applicable law, Tenn. Code Ann. § 36-6-404 and § 36-6-106, and made findings of fact and conclusions of law in accordance with these statutes. Moreover, the trial court's determinations were based, in part, on a credibility determination. Specifically and significantly, the trial court credited Mother's testimony but not Father's testimony. The court found in pertinent part:

- 7 -

The Court credits Mother's testimony and does not credit Father's testimony on this issue. Mother was a credible witness. She answered questions directly without equivocation or argument. . . . Her testimony was not impeached and her affect and demeanor was consistent with truthfulness. Father, by contrast, was evasive, often equivocal, and non-responsive in his testimony. He was impeached by cross-examination and admitted to testifying falsely at his deposition. He admitted to making false statements on important matters to Mother during the marriage. He destroyed, and otherwise, failed to produce relevant e-mails and text messages in his exclusive possession.

This credibility determination was instrumental in the court's final determination because, as described below, most factors weighed equally in favor of both parents. When reviewing a trial court's factual findings that rest on a determination of credibility and the weight of oral testimony, appellate courts give great deference to a trial court. *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006) (citing *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)); *Woodward v. Woodward*, 240 S.W.3d 825, 828 (Tenn. Ct. App. 2007). When it comes to live, in-court witnesses, trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). Therefore, "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id.* (quoting *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

The trial court considered the factors relevant to this case under Tenn. Code Ann. § 36-6-106(a). Specifically, the court addressed all factors except (12) and (13), which are not relevant to this case. The court found most factors weighed in favor of both parents equally.[1] However, the court found that factors (4), (8), (10), and (15) weighed against Father and in favor of Mother.

Father contends the trial court's findings are not supported by the evidence and that the trial court did not properly consider the relevant statutory factors. He also contends the trial court placed too much weight on Father's post-mediation behavior.

The trial court found that both parents have a strong and stable relationship with Elijah;[2] that both parents profess a willingness to facilitate and encourage a close and

---

[1] The court found instances in which factors (2), (3), (5), (6), (7), (8), (9), (11), (14), and (15) weighed in favor of both parents equally.
[2] Tenn. Code Ann. § 36-6-106(a)(1).

continuing parent-child relationship between Elijah and the other parent;[3] that the love, affection, and emotional ties between the parties and Elijah appear to be equal;[4] that Elijah is doing well in school, is appropriate for his grade level, and appears both happy and well-adjusted to both Father and Mother;[5] that both parents appear to equally possess the physical, emotional, and mental fitness to parent Elijah;[6] that Elijah is well bonded with both parents and with his extended family on both sides;[7] that there is no evidence of physical or emotional abuse or neglect;[8] and that both parents had attended the required parent education seminar.[9] Furthermore, the trial court found that after Elijah was born, Mother quit working outside the home in order to devote herself to caring for Elijah, but after Elijah turned two years old, Mother returned to work as a full-time pharmacist. After Mother returned to work, neither parent performed a disproportionate share of their parenting responsibilities.[10]

Although Father does not contest the findings of fact stated above, he does contest the trial court's findings and conclusions that favored Mother. Specifically, Father contends the trial court "illogically" relied on certain facts in its determination of factors (4), (8), (10), and (15) of Tenn. Code Ann. § 36-6-106(a). We will discuss each, in turn.

Subsection (4) concerns "[t]he disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care." Tenn. Code Ann. § 36-6-106(a)(4). In its review of subsection (4), the trial court found that because Father had a "considerable burden of personal unsecured debt, Mother [was] better situated and personally disposed to be able to provide Elijah with food, clothing, medical care, education, and other necessities, especially in the event of unforeseen economic hardship." While a parent's financial ability to provide for the child may be relevant, this factor is not to be judged solely on an assessment of the parents' respective incomes, assets, and/or liabilities. Instead, the focus should be on each parent's *disposition to provide*, which may hinge on each parent's track record of providing and each parent's present intention to provide for the child in the future. Accordingly, we respectfully disagree with the determination that this factor favors Mother, which determination is based, in significant part, on the court's finding that Father had a "considerable burden of personal unsecured debt. . . ."

---

[3] *Id*. at (2).
[4] *Id*. at (6).
[5] *Id*. at (7).
[6] *Id*. at (8).
[7] *Id*. at (9).
[8] *Id*. at (11).
[9] *Id*. at (3).
[10] *Id*. at (5).

Contrary to the trial court's finding, the record reveals that Father was able to and did provide for Elijah in a manner similar to Mother. Specifically, the trial court's finding was that neither parent performed a disproportionate share of parenting responsibilities after Mother returned to work. Furthermore, Father testified that Mother "told [Father] that [Father] spent too much time with [the child] and that [Father] doted on [the child] too much and [Father] was going to spoil [the child]. . . ." Father also testified that he has never had a problem providing food, clothing, or adequate housing for the child. Mother confirmed Father's conducted when she testified at trial. Mother confirmed that the "time that [Father] spent with Elijah and the activities that he and Elijah undertook" was factually correct. Accordingly, the evidence preponderates against this finding of fact. Therefore, we hold that this factor favors both parents equally.

Tenn. Code Ann. § 36-6-106(a)(10) concerns "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment[.]" Here, the trial court found that subsection (10) weighed in favor of Mother because Elijah has lived in his present home for nearly half of his life and that the home is "a stable [and] satisfactory environment." Father argues that "if courts were allowed to use mere retention of a martial residence as a basis for custody determinations, then the precedent would be that whichever party retained the residence would retain the children as well." We are not persuaded by Father's argument.

At the time of the hearing Father did not have a home or an apartment. Instead, he lived with his parents where Elijah did not have his own room. Father testified that he planned to buy a home in Elijah's school district with the $96,000 he received from the sale of a home but before he did that, he wanted to know the parenting schedule. The trial court found Father's testimony unpersuasive and found that it was undermined by the fact that he had $200,000 in unsecured debt from credit cards and student loans. The evidence does not preponderate against these findings.

The trial court found that factors (8) and (15) of Tenn. Code Ann. § 36-6-106(a) favored Mother. Subsection (8) concerns "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child," and subsection (15), which is a catch-all provision, permits the court to consider "[a]ny other factors deemed relevant by the court." The trial court found both factors weighed against Father for the following reasons:

> Father, who holds a master's degree in alternative dispute resolution from Pepperdine University, sent an e-mail to his academic mentor . . . on July 20, 2016, at 6:56 a.m., [the morning after he agreed to the mediated PPP] in which he wrote: "I am hoping to get out of the [the MDA] and at least put more pressure on [Mother]." He testified the goal of this pressure was to obtain co-equal parenting time. Next, on July 21, 2016, at 11:12 a.m., Father composed Trial Exhibit 5, which is the text of a self-described

confession he caused to be read aloud in his church in Mother's presence. The contents of [the confession] suggest this . . . was calculated to apply psychological or moral pressure on Mother to submit to his demands for more parenting time. Third, during the night of July 20, 2016, Father communicated to his lawyer at the time, the allegation that Mother had twice slapped him in the face during an unprovoked argument earlier that night. Mother admits she had a contentious conversation with Father the evening of July 20, 2016, on the subject of whether Elijah ought to be enrolled in a private school rather than Trinity Elementary School, where Mother mistakenly believed the children of the woman who whom Father was having an extramarital sexual relationship also attended. Otherwise, Mother denies she slapped Father on July 20, 2016.

. . .

Father's conduct in repudiating the Agreed PPP and undertaking to pressure Mother into a modification she honestly disagreed with calls into question Father's moral fitness to parent Elijah. The fact Father is a highly educated man, who holds a graduate level degree in alternative dispute resolution, makes his conduct following the mediation more culpable.

The trial court's determination is also supported by Father's dishonest conduct throughout the litigation. Father initially testified in his deposition that he decided to rescind his consent to the Agreed PPP after Mother allegedly slapped him on July 20, 2016. However, at trial, Father admitted that this was false, and he had already decided to rescind his consent when he e-mailed his academic mentor the morning after mediation on July 20, 2016, at 6:56 a.m. At trial, the colloquy went as follows:

Q: . . . The truth is that you had made up your mind at least by 6:56 A.M. the morning of July 20th, that you wanted to get out of this deal; correct?
A: Yes, sir.
Q: And it wasn't trigged by whatever happened later that night, was it?
A: No, sir.
Q: So what I asked you those questions in the deposition and you said that it was triggered by the events in your bedroom that night, that was false, wasn't it?
A: Yes, sir.

As the foregoing reveals, the evidence does not preponderate against the trial court's findings or its conclusion that factors (8) and (15) favor Mother.

Although we determined that the trial court misconstrued Tenn. Code Ann. § 36-6-106(a)(4) – disposition to provide for the child – several other factors favor Mother while no factors favor Father over Mother.

Having examined the trial court's findings of fact, we now address Father's contention that the trial court abused its discretion by failing to give Father additional time when Mother admitted that such additional time would have no detrimental impact on the child.

The Agreed PPP provided that Father was entitled to spend every other weekend from Friday after school or at 3:00 p.m. if no school, through Monday at 9:00 p.m. The permanent parenting plan established by the trial court modified the time from 9:00 p.m. to 8:00 p.m. Father argues that "there exists no basis for the trial court to opine that [the] additional time [Father requested] is detrimental in some way" because Mother testified the additional time would have "no detrimental impact" on the child.

The trial court found that a return time of 9:00 p.m. on Mondays was no longer necessary because Mother's work day ended no later than 6:30 p.m. The trial court's determination is supported by the following colloquy between the trial court and Mother:

> Q: . . . the return time when father brings [the child] back . . . is 9:00 P.M. -
> A: Yes.
> Q: -- on Monday. That just seems to be a little late for a kindergartener. Why was 9:00 the agreed-upon time?
> A: At the time I was working until 8:00 on Monday nights, and we just -- I drive 30 minutes from Smyrna, and we just made it 9:00, but since then, I do not work -- I only work till 5:00 or 6:00.
> Q: All right. Do you believe that it would be in Elijah's interest to have the return time earlier in the day?
> A: Yes. And he has not returned at 9:00 ever since we've been under this agreement. He has come between 7:00 and 8:00, 8:30 at the latest.
> Q: Okay, So Father brings Elijah back at a time consistent with his routine bedtime?
> A: Yes.

Regardless of whether the parties agree to a specific term in a parenting plan, the trial court must review the plan to determine whether it is in the best interest of the child. *See* Tenn. Code Ann. § 36-6-106(a). The trial court's determination was supported by the testimony above, and Father failed to show that the trial court's determination was not based on fact, that the trial court misapplied the law, or that the decision was illogical.

As noted earlier, trial courts enjoy broad discretion in formulating parenting plans, and "determining the details of parenting plans is 'peculiarly within the broad discretion

of the trial judge.'" *C.W.H.*, __ S.W.3d __, 2017 WL 6462395, at *4 (citing *Armbrister*, 414 S.W.3d at 693; quoting *Suttles*, 748 S.W.2d at 429). Moreover, we review a trial court's decision regarding parenting schedules for an abuse of discretion. *Id*. The abuse of discretion standard does not permit reviewing courts to substitute their discretion for that of the trial court. *Lee Med., Inc.*, 312 S.W.3d at 524. Having applied the foregoing standards in considering this issue, we find no abuse of discretion in the trial court's determinations concerning the parenting schedule and Father's parenting time.

## II. RIGHT-OF-FIRST-REFUSAL

Father contends the trial court abused its discretion by failing to give Father his requested right-of-first-refusal when Mother admitted that the right-of-first-refusal was acceptable. Father also contends the trial court erred by modifying the order *sua sponte* without notice to the parties.

The Agreed PPP provided that if either parent "[had] to be away from the child for a period of more than six hours during his allotted parenting time, he shall offer the first right of refusal to the other parent to care for the child during that time." Mother argued that the provision should be modified because Father's right-of-first-refusal would be triggered every day Mother worked. Mother also argued that the provision should require advance notice to the parties.

The trial court agreed with Mother and did not adopt the language in the Agreed PPP. Instead, the final parenting plan provides that if one parent is away from the child for twelve hours or more, he or she will give the other parent the right-of-first-refusal. The provision in the final plan also provides that the right-of-first-refusal will be offered to the other parent seven days in advance. The trial court then stated:

> * The right of first refusal set out in item J.2. shall <u>NOT</u> be construed to apply to circumstances where (1) the residential parent is absent due to routine work, (2) where child is in school or on school-related trips, or where child and residential parent are together traveling out of the local area.

Had the court adopted the right-of-first-refusal provision in the Agreed PPP, Father's right-of-first-refusal would have been triggered every day Mother worked. Thus the trial court's decision to deviate from the Agreed PPP was reasonable, and Father's arguments to the contrary are unavailing. Accordingly, we have determined that the trial court did not abuse its discretion.

Father also takes issue with the trial court's decision to modify the right-of-first-refusal provision *sua sponte* without notice to the parties. When Mother's counsel presented the proposed permanent parenting plan to the court along with the notice of

filing, all of which was served on Father's counsel, it included three alternatives for the "right-of-first-refusal" provision. Four days after the proposed order was submitted, the trial court approved a modified version of the provision as set forth above.

Seven days after the proposed order was submitted to the trial court, counsel for Father filed a response, arguing it was "procedurally inappropriate for [Mother] to attempt to modify the Court's order by way of a Notice of Filing. If [Mother] [was] dissatisfied with the Court's ruling she ha[d] remedies available to her under the Tennessee Rules of Civil Procedure." Furthermore, Father contended that the procedure the trial court followed prevented Father "from fully responding and [did] not provide for a hearing on the issue." However, Father did not submit an alternative proposed order, an omission we find significant.

Tenn. 21st J. Dist. R. 11.01 states that "[i]f the proposed order does not reflect that it has been approved for entry by counsel for all parties, then the court will take no action to enter such proposed order for seven (7) days after receipt of the proposed order to afford counsel for the opposing party *to submit an alternative proposed order*." (emphasis added). Although the trial court approved the proposed order only four days after its receipt, it is clear from the trial court's review of the three proposals, which included Father's proposed language, and the trial court's hand-written inscription, that the trial court did not approve the parenting plan carte blanche. Rather, the trial court considered the alternatives and came to its own decision. Moreover, Father failed to comply with and take advantage of Local Rule 11.01 because he did not "submit an alternative proposed order." Therefore, if there were error, it was not reversible error.

Also significant is the fact that the trial court's order stated that a right-of-first-refusal "consistent with" Father's proposal was to be included and the version that was finally approved by the trial court was consistent with Father's proposal.

Further, the trial court's memorandum order was not a final judgment. "By definition, an 'interlocutory order' cannot be a 'final judgment.'" *In re Estate of Ridley*, 270 S.W.3d 37, 40 (Tenn. 2008). "A final judgment is one that resolves all the issues in the case, 'leaving nothing else for the trial court to do.'" *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn. 2003) (quoting *State ex rel. McAllister v. Goode*, 968 S.W.2d 834, 840 (Tenn. Ct. App. 1997)). In the very order Father claims to be a final judgment, the trial court instructed counsel for Mother to "prepare, file, and serve proposed Permanent Parenting Plan, using the approved form, containing the terms and conditions of Trial Exhibit 4 as modified by this Memorandum and Order." Therefore, there was something else to be done before there could be a final judgment in this case.

"[A]s a general rule a court has the authority to retroactively modify a temporary or interlocutory order." *State ex rel. Jackson v. Jackson*, No. M2006-00598-COA-R3-

- 14 -

CV, 2008 WL 820495, at *5 (Tenn. Ct. App. Mar. 26, 2008). As provided in the Tennessee Rules of Civil Procedure:

> ... any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and *the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of the parties*.

Tenn. R. Civ. P. 54.02. (emphasis added). In other words,

> [a]n interim order is one that adjudicates an issue preliminarily; while a final order fully and completely defines the parties' rights with regard to the issue, leaving nothing else for the trial court to do. Until a judgment becomes final, it remains within the court's control and may be modified any time prior to the entry of a final judgment.

*McAllister*, 968 S.W.2d at 840 (citations omitted). Accordingly, the trial court acted within its authority and discretion in modifying its interlocutory order.

### III. TRIAL COURT'S AWARD OF ATTORNEY'S FEES

Father contends the trial court erred in its award of attorney's fees to Mother. Father specifically argues that "his action in repudiating the mediated agreement was well within his rights." Furthermore, Father argues that "he was not requesting of the court anything more than is contemplated by statute . . . [and] that he should not be penalized for asserting a right provided by statute in good faith." We disagree with Father's characterization of his actions and his conclusion.

The trial court awarded Mother her attorney's fees based on the following:

> The Court finds the parties reached an agreement regarding spousal support and the allocation of fees at the mediation of July 19, 2016, however, Father undertook to repudiate that mediated agreement and to pressure Mother into modifying the Agreed PPP in a manner she believe[d] was not in the best interest of the child. But for Father's actions in this regard, Mother would not have incurred fees and expenses post-mediation, which have now altered the negotiated balance of spousal support achieved at mediation.

Father's argument that the trial court "penalized Father for asserting his right to ask that the trial court conduct a hearing and determine a parenting arrangement" lacks a

- 15 -

factual foundation. He simply argues that he should not pay attorney's fees for repudiating the mediated agreement. As the trial court stated in quoting *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992), "requiring parents who precipitate custody or support proceeding to underwrite the costs if their claims are ultimately found to be unwarranted is appropriate as a matter of policy."

"The award of attorneys' fees is within the trial court's discretion." *Huntley v. Huntley*, 61 S.W.3d 329, 341 (Tenn. Ct. App. 2001). In this case, it does not affirmatively appear that the award of attorney's fees was against logic or reasoning, or that it has caused an injustice; therefore, we are unable to conclude that the trial court abused its discretion in awarding Mother her attorney's fees. *See id*. Accordingly, we affirm the award of attorney's fees to Mother.[11]

IV. ATTORNEY'S FEES ON APPEAL

Mother contends Father's appeal should be deemed frivolous. Alternatively, she seeks an award of her legal fees and expenses incurred on appeal.

This court is statutorily authorized to award just damages against the appellant if we determine the appeal is frivolous or that it was taken solely for delay. Tenn. Code Ann. § 27-1-122. The statute, however, is to "be interpreted and applied strictly" to avoid discouraging legitimate appeals. *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001) (quoting *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977) (discussing the predecessor of Tenn. Code Ann. § 27-1-122)). A frivolous appeal is one that is devoid of merit or has no reasonable chance of success. *Id.*

Having considered the above and the record before us, we are unable to conclude that this appeal is devoid of merit. Accordingly, we do not find the appeal frivolous.

The foregoing notwithstanding, we have the discretion to award attorney's fees incurred on appeal in circumstances other than frivolous appeals. *See Wills v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When deciding a request for attorney's fees, we will consider "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014). Having considered these factors and the facts and circumstances of this case, we conclude that Mother is entitled to recover the reasonable and necessary attorney's fees she incurred in this appeal. Accordingly, on remand the trial court should make the appropriate award.

---

[11] Father did not challenge the amount of the award of attorney's fees; thus, we have not analyzed the amount of the award.

- 16 -

## In Conclusion

The judgment of the trial court is affirmed, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellant, Charles Michael Kincade.

_____
FRANK G. CLEMENT JR., P.J., M.S.