## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 22, 2018 Session

## AMY (WISEMAN) BOWEN v. WILLIAM S. WISEMAN, II

**Appeal from the Chancery Court for Sumner County**
**No. 2007D484      Louis W. Oliver, Chancellor**

———————————————————

## No. M2017-00411-COA-R3-CV

———————————————————

This case involves a post-divorce modification of a parenting plan. Father petitioned the court seeking equal parenting time and major decision-making authority with respect to decisions involving the child's education, non-emergency healthcare, and extracurricular activities. Mother filed a counter-petition seeking additional parenting time and exclusive major decision-making authority. Mother also asked the trial court to clarify the meaning of several terms in the parties' parenting plan. The parties' disagreement concerning the meaning of several terms had prompted ongoing conflict. The trial court found that there had been a material change in circumstances and that modification of the parties' parenting plan was in the child's best interest. The trial court modified the parties' parenting plan, awarding Mother additional parenting time. However, the trial court ordered that major-decision making authority in the areas of non-emergency healthcare, extracurricular activities, and religious upbringing remain joint. The trial court also awarded Mother a portion of her attorney's fees. Father timely appealed. We affirm the judgment of the trial court and award Mother her attorney's fees on appeal.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Dana C. McLendon, III, Franklin, Tennessee, for the appellant, William Samuel Wiseman, II.

John R. Phillips, Gallatin, Tennessee, for the appellee, Amy (Wiseman) Bowen.

# OPINION

## BACKGROUND

Amy (Wiseman) Bowen ("Mother," or "Appellee") and William S. Wiseman, II ("Father," or "Appellant") are the parents of one minor son, born November 2005 (the "Child"). During their marriage, Mother and Father resided in Hendersonville, Tennessee. The parties were divorced on March 18, 2009. Father has since relocated to Mt. Juliet, Tennessee. Father is a pediatrician who currently works as an independent contractor performing in-home physical examinations for an insurance company. Mother is a first grade teacher at the Child's elementary school. Mother remarried in March 2013. Another son was born to Mother and her new husband in 2015.

Concurrent with their divorce, the trial court entered a permanent parenting plan naming Mother as the primary residential parent. The parties' original parenting plan was amended by an order entered March 16, 2012 (the "March 2012 Parenting Plan.").[1] Under the March 2012 Parenting Plan, Father was allocated 149 days of parenting time per year, and Mother was allocated 216 days of parenting time per year. Mother was awarded sole decision-making authority over major decisions related to the Child's education, and the parties continued to have joint decision-making authority concerning the Child's non-emergency healthcare, religious upbringing, and extracurricular activities. On January 18, 2013, the trial court entered an "Agreed Order and Amendment" to the March 2012 Parenting Plan (the "January 2013 Agreed Order"). Relevant to the current proceedings, the amendment provided that each party had a "right of first refusal for child care." The right of first refusal specifically provided that "[i]f either parent is unable to care for the child during his or her parenting time for more than four hours they will notify the other parent who has the right of first refusal for child care." The amendment also added a provision mandating that the parties give each other at least two months' notice concerning any extracurricular activities he or she intended on signing the Child up for.

On November 13, 2013, Father filed a petition to modify the parties' parenting plan. Father alleged that a material change in circumstances had occurred since the entry of the January 2013 Agreed Order. Specifically, Father alleged that Mother had "made continuous attempts to distance the minor child from the Father," and that she had failed to include Father in joint decision-making with respect to decisions involving the Child's extracurricular activities and non-emergency healthcare. Father also alleged that Mother failed to "give Father the right of first refusal . . . [by allowing] the minor child to go home with friends instead of giving the Father an opportunity to care for the child." Father sought additional parenting time and sole decision-making authority for decisions

---

[1] The court's order indicates that Mother petitioned the trial court to amend the original parenting plan and to hold Father in contempt.

involving the Child's non-emergency healthcare, education, and extracurricular activities. Father also asked that his parenting time be increased to 160 days per year, and Mother's parenting time be reduced to 205 days per year.

On December 23, 2013, Mother responded to Father's petition, averring that there had not been a material change in circumstances.[2] On July 28, 2014, Mother filed a motion to amend her response and to file a counter-complaint. Mother was granted permission by order entered August 27, 2014. On September 17, 2014, Mother filed a counter-complaint seeking exclusive major decision-making authority with respect to decisions involving the Child's extracurricular activities and non-emergency healthcare. Mother also sought additional parenting time in the summer, alleging that Father had manipulated the schedule such that she was unable to see the Child for approximately one month. Mother averred that Father's "unhealthy obsession" with the Child made joint decision-making impossible. Specifically, Mother alleged that Father had insisted on multiple mediations because she refused to allow the, then seven-year-old Child, to participate in extracurricular sports leagues outside of Hendersonville during the schoolyear. Mother also averred that the Child had been dropped by his pediatrician because of Father's "harassing telephone calls," and that on-going conflict had arisen because of Father's "vehement[] complain[ts] that the Child had undergone a routine tooth cleaning without his (Dr. Wiseman's) participation." Mother also sought additional clarifications with respect to the parties' parenting plan. For example, Mother asked the trial court to clarify that the "right of first refusal" did not prevent the Child from participating in overnight sleepovers with friends or family members during Mother's parenting time without Father first being given the opportunity to babysit the Child. Mother filed a proposed parenting plan with her amended counter-complaint seeking, *inter alia*, that she be awarded 235 parenting days per year, and Father's parenting time be reduced to 130 days per year.

On August 14, 2015, Father filed an amended proposed parenting plan asking that he be awarded 182 days of parenting time per year and Mother's parenting time be reduced to 183 days per year. On October 15, 2015, Father filed a "motion for temporary restraining order" asking that the court "restrain" Mother from "unilaterally" enrolling the Child in any extracurricular activities or making any non-emergency medical healthcare appointments pending a final hearing. He also filed a "motion for adjustment of parenting schedule" seeking modifications to the parties' schedule for the upcoming holiday season. On November 6, 2015, the trial court denied Father's motions pending a final hearing. On January 27, 2016, Mother filed a proposed amended parenting plan

---

[2] On March 14, 2014, Father filed a *pro se* petition to modify child support alleging that there had been a change in his employment income that would result in at least a fifteen percent change to his child support obligation. Father's attorney filed a motion to withdraw following Father's filing of the petition to modify child support, alleging that she had lost contact with Father. The motion was granted by order entered on March 31, 2014, and Father was given 30 days to obtain substitute counsel or "be expected to proceed *pro se*."

asking that she be awarded 245 days of parenting time per year, and Father's parenting time be reduced to 120 days per year.

On February 2, 2016, Father filed a ten-count criminal contempt petition against Mother pursuant to Tennessee Code Annotated section 29-9-101. Father alleged that Mother had "willfully violated" the parenting plan by refusing to make joint decisions with Father and by refusing to honor the "right of first refusal."[3] Following a full-day hearing, the trial court dismissed Father's contempt petition in its entirety.

The case proceeded to trial on August 31 and September 1, 2016. The trial court heard testimony from ten witnesses including Father, Mother, the Child, Mother's new husband, and the Child's school principal. Both parents testified concerning the on-going conflict that they were experiencing based on their differing interpretations of terms contained in the parenting plan. The parties testified that they disagreed concerning the "right of first refusal." Father testified that he believed the "right of first refusal" required Mother to notify him and give him the opportunity to care for the Child anytime the Child would not physically be in Mother's presence during her parenting time. Mother testified that she felt the "right of first refusal" was only implicated if she had to work, travel outside of town, or was otherwise rendered "unable" to care for the Child.

Father testified that he believed "joint major non-emergency healthcare decision-making" meant that he should be included in all dental visits, orthodontist visits, and doctors' appointments, and he felt he "had been deprived of going [to] multiple dentist visits and multiple visits to the pediatricians' offices[.]" Father testified that he felt it was reasonable to ask Mother to reschedule the appointments if he could not be there. Mother testified that she felt Father was overbearing and controlling, and she did not feel that she needed Father's permission to take the Child to have a routine dental cleaning or to get a flu shot. Mother testified that she felt the Child could benefit from counseling, but Father refused to agree. Father testified that he opposed allowing the Child to attend counseling because he felt the Child's anxiety would be resolved on its own if the trial court awarded him equal parenting time, and he did not feel the Child had a "severe case" of anxiety warranting professional treatment.

Both parents testified extensively concerning the on-going conflict with respect to the Child's extracurricular activities. Mother testified that she did not want the Child to participate in activities outside of Hendersonville during the school year because of time constraints during the school week. Mother and Father also testified concerning their differing interpretations of the term "extracurricular activity." Mother testified that she did not feel "extracurricular activity" included clubs during the school day such as

---

[3] For example, Father alleged that Mother failed to include Father in the decision to allow the Child to participate in robotics club, fourth grade chorus, and a sleepover at a friend's house without first seeking Father's approval.

robotics club and fourth grade chorus. Father testified that he felt Mother violated the parenting plan by, *inter alia*, failing to inform him that the Child intended to tryout for fourth grade chorus until the day of the tryouts. Mother testified that the Child changed his mind concerning his intention to tryout several times, and she did not know if the Child wanted to participate until the day of the tryout.

Father testified that he felt the Child was "well-adjusted" and doing well academically and athletically, but he felt that the Child "could be doing much better." Father testified that he felt the Child knew that equal parenting time was important to Father. Mother testified that she felt it would be in the Child's best interest to continue to reside with her for the majority of the time. She testified that he gets straight A's, gets along well with his stepfather and brother, and she thinks he is happy.

Prior to trial, the trial court ordered both parties to undergo psychological evaluations by Dr. David McMillan pursuant to Rule 35 of the Tennessee Rules of Civil Procedure. Dr. McMillan's report was admitted into evidence and relied upon by the trial court. The report was not favorable towards Father.[4] Father testified that he "didn't know" if Dr. McMillan had a reason to be biased against him, but he did not feel that the psychological evaluation and report revealed an accurate depiction of him as a father.

On October 19, 2016, the trial court entered a final order incorporating the trial court judge's oral findings from a hearing, which was held on September 16, 2016. The trial court found that a material change in circumstances had occurred and that a modification of the parties' parenting plan was in the Child's best interest. Taking into account the relevant statutory factors, the trial court made several modifications to the parties' parenting plan. Father's parenting time was reduced to 130 days per year, and Mother's parenting time was increased to 235 days per year. The trial court ordered that major decision-making authority concerning decisions related to the Child's extracurricular activities and non-emergency healthcare would remain joint, but the Child would only participate in extracurricular activities located within Sumner County, except for activities that were sponsored by Father's church. The trial court also made several clarifications at Mother's request. The trial court stated that Mother was entitled to make "routine" healthcare decisions, such as when to take the Child to a dental cleaning and flu shot, without Father's involvement. The trial court also clarified that the term "extracurricular activity" did not include clubs sponsored by the Child's elementary school, and Mother was not required to consult Father before signing the Child up for activities like robotics club and fourth grade chorus. The trial court also gave Mother permission to choose a counselor for the Child and to send the Child to counseling if the counselor felt it was necessary.

---

[4] For example, Dr. McMillan opined that "some aspects of [Father's] relationship with the Child are alarming," and that Mother has the healthier relationship with the Child.

Both parties filed motions to alter or amend, which were denied. Mother also filed a motion for an award of attorney's fees. Mother alleged that she had incurred a total of $57,235.00 in attorney's fees as a result of the litigation. On February 2, 2017, the trial court issued a final order, awarding Mother $18,345.00 for her attorney's fees.

## ISSUES PRESENTED

Father has raised several issues for our review, which we perceive as four dispositive issues. We have reordered and rephrased the issues raised by Father as follows:

- Whether a preponderance of the evidence supports the trial court's best-interest findings.
- Whether the trial court committed reversible error by considering Father's testimony that he experienced debilitating depression during a time period that predated the entry of the January 2013 Agreed Order.
- Whether the trial court abused its discretion in crafting the parties' new permanent parenting plan.
- Whether the trial court abused its discretion in awarding Mother a portion of her attorney's fees.
  In the posture of Appellee, Mother raises the following issue for our review:
- Whether she should be awarded attorney's fees for the cost of this appeal.[5]

## STANDARD OF REVIEW

In an appeal from a bench trial, we review findings of fact "*de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). However, we review questions of law *de novo* with no presumption of correctness. *See Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). "A trial court's determination of whether a change in material circumstances has occurred and whether modification of a parenting plan serves a child's best interest are factual questions." *Id.* at 692–93 (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *Id.* (citations omitted).

The Tennessee Supreme Court summarized the standard of review applicable in an appeal concerning a custody modification as follows:

---

[5] Mother also originally asked that she be awarded discretionary costs in the trial court. However, her attorney waived the issue at oral argument.

Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record."

*Id*. at 693 (internal citations omitted).

**DISCUSSION**

Cases involving custody and visitation arrangements are among the most important decisions that courts make. *See Krupp v. Cunningham–Grogan*, No. M2005-01098-COA-R3-CV, 2016 WL 2505037, at *6 (Tenn. Ct. App. Aug. 29, 2006) (citation omitted). When a court is tasked with fashioning a permanent parenting plan, the chief purpose is always "to promote the child's welfare by creating an environment that promotes a nurturing relationship with both parents." *Id.* (citing *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996)).

In a post-divorce proceeding in which a party has asked the court to modify a permanent parenting plan, the court first must determine whether a material change in circumstances has occurred since the last parenting plan was entered by the court. *See* Tenn. Code Ann. § 36-1-101(a)(2); *Armbrister*, 414 S.W.3d at 697–98. If the trial court determines that a material change in circumstances has occurred, the court must then, and only then, determine what modification, if any, is in the child's best interest by applying the relevant factors enumerated in Tennessee Code Annotated section 36-6-106. *See* Tenn. Code Ann. § 36-6-106(a)(1)–(15). Tennessee Code Annotated section 36-6-106(a) provides that a trial court fashioning a permanent parenting plan should consider the following factors, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

*Id*.

In this case, the trial court concluded that a material change in circumstances had occurred.[6] The trial court then found that factors (1), (2), (5), (7), (8), (9), (10), and (15) weighed in Mother's favor. *See id.* The trial court made extensive findings to support its conclusions and modified the parties' parenting plan as discussed in detail above.

---

[6] Tennessee Code Annotated section 36-6-101(a)(2)(C) provides as follows:

If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

On appeal, Father avers that the evidence preponderates against the trial court's findings with respect to factors (2), (7), (8), and (15). Furthermore, Father avers that the trial court erred in relying on Dr. McMillan's "biased" report, by relying on the tone of an email he sent to Mother as indicative of his general attitude towards Mother, by taking judicial notice of improper facts, and by generally failing to credit Father's testimony over Mother's. Father also avers that the trial court improperly considered evidence involving events that predated the January 2013 Agreed Order. Father avers that these errors taken together led the trial court to abuse its discretion in fashioning a permanent parenting plan, and he urges this Court to vacate the trial court's order and adopt his proposed parenting plan. We will evaluate Father's assignments of error in turn.

### A. Best-Interest Analysis

As mentioned above, once a trial court has determined that a material change in circumstance has occurred, the court must perform a best-interest analysis to determine what modification, if any, is in the child's best interest. *See* Tenn. Code Ann. § 36-6-101; Tenn. Code Ann. § 36-6-106. The trial court made detailed findings concerning the relevant statutory factors and determined that a modification of the parties' parenting plan was in the Child's best interest. The trial court found that Mother would be more likely to facilitate a close relationship between Father and the Child, and that she would be more likely to respect the parenting plan and other court orders. *See* Tenn. Code Ann. § 36-6-106(a)(2). In deciding that this factor weighed in favor of Mother, the trial court pointed out that after a full-day hearing was held on Father's ten-count contempt petition against Mother, the trial court dismissed the entirety of the petition. The trial court also included the full text of an email in its order, in which Father was rude to Mother and demanded an apology from Mother "based upon the way [she] handled the Polar Express in 2009." The trial court first pointed out that the incident was seven years ago; and stated that the tone was "basically expressed throughout a number of emails that the court [had] reviewed." The trial court then stated that it found the tone "somewhat concerning regarding the cooperation and attitude of cooperation brought forth by the father in this case."

Father avers that the trial court held "one email" against him, "among dozens and dozens in evidence." Father avers that the "dissimilar email" is not representative of the "tone and tenor" of the emails generally. We find Father's complaint unpersuasive and in clear contradiction of the evidence in the record, which reveals multiple instances in which Father has approached Mother with a condescending and uncooperative attitude. The evidence clearly supports the trial court's finding. *See id.*

Father also avers that the trial court erred in relying on negative statements about him contained in Dr. McMillan's report. The trial court incorporated the findings of Dr. McMillan into its order, stating, in part, as follows:

The Court would also note in the report of Dr. McMillan, which has been submitted into evidence,

> "I find [Mother] to have the healthier relationship with their son [the Child]. She appears to be less in mesh with [the Child] and have a more balanced set of relationships in her life. She is aware of her son's anxiety, but she does not use his condition to demonize the father or to elevate her parental status over the father."

Father takes issue with the trial court's reliance on Dr. McMillan's report. However, Father cites no reason why the court's reliance was improper other than his personal belief that the report is "biased" and "speculative." Father also takes issue with the trial court's reliance on Dr. McMillan's report in deciding that factors (7) and (8) weighed in favor of Mother. We have concluded that the trial court's reliance on Dr. McMillan's opinion was appropriate in this case, and the evidence preponderates in favor of the trial court's findings with respect to factors (2), (7), and (8). *See* Tenn. Code Ann. § 36-6-106(a) (2), (7), (8).

Father also avers that the trial court erred in finding that factor (15) weighed in Mother's favor because the trial court took judicial notice of the location of Father's home and the timing of "rush-hour." Factor (15) authorizes a trial court to consider any other factor deemed relevant to a child's best interest. *See* Tenn. Code Ann. § 36-6-106(a)(15). In this case, the trial court took judicial notice of the distance from the Child's school to Father's house and the timing of "rush-hour" before making the following findings with respect to factor (15):

> The Court finds it's not in the best interest of the minor child to travel to and from school for that distance on a regular basis or on a 50/50 basis. And the Court further finds that it was the conscious decision on the part of the father to move to Mt. Juliet and certainly placed himself in a position to make the location of the residences of the parents a factor to be considered by the Court when the Court has to take into account the best interest of the child and whether the child should be required to drive that distance every morning and every evening to attend school on a 50/50 basis.

Father avers that "[t]he trial court's remarks reveal that the court's assessment of that commute was the single, or at least single most compelling, reason for its decision to deny Dr. Wiseman substantially equal intervals of parenting time." We disagree.

"Facts relating to human life, health and habits, management and conduct of businesses which are common knowledge may be judicially noticed." *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560, 564 (Tenn. Ct. App. 1985). "A judicially noticed fact

must be 'one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *See In re Grace N.*, No. M2014-00803-COA-R3-JV, 2015 WL 2358630, at *6 (Tenn. Ct. App. 2015) (quoting Tenn. R. Evid. 201(b)).

It is common knowledge that children travel to school during the same time when many people commute to work, and there is often heavy traffic during, so-called, "rush-hour." Furthermore, the distance between Father's house and the Child's school is capable of accurate and ready determination from sources whose accuracy cannot be reasonably questioned. Moreover, it is not the exact distance that mattered to the trial court in this case. Father testified that he moved away from Hendersonville "to get away from the drama." As the trial court pointed out, "it was the conscious decision on the part of the father to move to Mt. Juliet and certainly [place] himself in a position to make the location of the residences of the parents a factor to be considered by the Court[.]" It is undisputed that Mother's house is located considerably closer to the Child's school, and the Child spends less time in the car traveling from her house to school in the morning and afternoons. Moreover, Father testified that it takes approximately thirty-five minutes to travel to the Child's school in the morning. We discern no error with respect to the trial court's decision to consider the proximities of the parties' homes to the Child's school when considering the Child's best interest.

We also disagree with Father's characterization of the location of the residences as the "single most compelling" reason the trial court gave for failing to adopt Father's parenting plan. The trial court made findings with respect to nearly every best-interest factor and considered the totality of the circumstances, including the Child's need for stability, the Child's good relationship with his stepfather and little brother, the Child's academic and athletic success while living with Mother, Mother's comparative willingness to cooperate with Father, Father's attitude towards Mother, Father's choice to move to another city, Dr. McMillan's opinions of both parents, and Father's refusal to allow the Child to attend therapy. For the foregoing reasons, we have concluded that the evidence preponderates in favor of the trial court's best-interest findings.

## B. *Res Judicata*

Father also avers that the trial court committed reversible error by admitting and considering evidence pertaining to events that took place before the entry of the January 2013 Agreed Order. Specifically, Father avers that the trial court should not have permitted Father to testify concerning "a period of time during which [Father] suffered from a disabling, but temporary, depression" and several other incidents which took place before January 2013 on the basis of *res judicata*.[7]

---

[7] The court permitted Father to testify over Father's attorney's objection. Father testified that he

As an initial matter, we point out that the trial court judge only indicated that he had considered evidence from events that took place before the January 2013 Agreed Order with respect to a single best-interest factor, namely "the moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child." *See* Tenn. Code Ann. § 36-6-106(a)(8). Thus, even assuming, *arguendo*, that the trial court erred in admitting evidence concerning events that took place before the entry of the January 2013 Agreed Order, there is sufficient evidence to uphold the trial court's best-interest findings and residential parenting plan modifications. However, because it appears that there was some confusion regarding the admissibility of evidence concerning events which took place before the January 2013 Agreed Order was entered, we will briefly clarify the context of the dispute and offer a brief explanation of why we disagree with Father's understanding of *res judicata*. During trial, Mother's attorney attempted to cross-examine Father concerning various events that took place before January 2013, and Father's attorney consistently objected. For example, while Father was being questioned during cross-examination concerning an incident involving the Child's school,[8] the following exchange occurred:

> Q: [by Mother's attorney]: When you've had an issue with the school, did you attempt to go to the director, the superintendent of the school to complain?
>
> [Father's attorney]: Again, I'm going to ask whether or not—
>
> [The Court]: Overruled. Let him answer the question.
>
> Q: [by Mother's attorney]: Is that the way you handle conflict with the school?
>
> A: [Father]: What conflict are you speaking of?
>
> Q: [by Mother's attorney]: Well, I know of at least two times you've been to the director of schools [i.e., the superintendent] to complain.

was unemployed due to his disabling depression for a period of time in 2009 and 2010.

[8] Father testified that he was told by the Child's principal that Mother and Father could no longer use the school office to store and exchange the Child's weekend bag and would need to make arrangements to exchange the bag off campus. Father testified that he felt this change was "unreasonable," so he contacted the superintendent. Father testified that he also contacted the superintendent/director of the school system when he felt that Mother had sent the child back to school before the Child's antibiotics for strep-throat had fully taken effect. Father admitted that Mother told him that the Child's doctor said it was fine for the Child to return to school and that he did not call the pediatrician to ask before contacting the superintendent.

[Father's attorney]: Objection. With all due respect—

[The Court]: The Court finds, certainly, if, in fact, he has in some manner inappropriately acted toward the school system, that comes into whether the Court should appoint him as the decision-maker on the schools. The Court finds this information is certainly relevant to the Court's consideration for that factor.

[Father's attorney]: If I may just for the purposes of the record . . . I don't disagree that it would be relevant. I disagree that it is admissible if it is prior to January 2013 because it is *res judicata* as a matter of law not available to influence this decision.

We will briefly explain the doctrine of *res judicata*, and why it does not apply to bar evidence concerning events that took place before the previous order was entered when the trial court has already determined that a material change of circumstances has occurred and is tasked with determining how to modify a parenting plan consistent with the best interest of a child. "*Res judicata* is a defense when the same cause of action has been previously litigated by the same parties, and it bars relitigation of all issues that were or could have been litigated in the first case." *Wheeler v. Stophel & Stophel*, 1989 WL 157823, at *1 (Tenn. Ct. App. Dec. 29, 1989); *Jackson v. Smith*, 387 S.W.3d 486, 490 (Tenn. 2012) ("The doctrine of *res judicata* or claim preclusion bars a second suit between the same parties or their privies on the same claim with respect to all issues which were, or could have been litigated in the former suit . . . and it promotes finality in litigation, prevents inconsistent or contradictory judgments, conserves judicial resources, and protects litigants from the cost and vexation of multiple lawsuits."). The Tennessee Supreme Court explained the historical evolution and implication of *res judicata* in child custody modification proceedings as follows:

At common law, once a term of court ended, trial courts had only limited authority to modify divorce decrees. The General Assembly eventually enacted statutes specifically empowering trial courts to retain jurisdiction over and to modify divorce decrees and custody decrees.

The concept of material change in circumstances originated in *Hicks*, where the Court of Appeals was asked to determine whether the statute empowering courts to modify custody decrees deprived such "decrees of their quality of finality as adjudications" for purposes of the doctrine of *res judicata*. *Hicks*, 176 S.W.2d at 375. The Court of Appeals answered this question in the negative, explaining:

They are final for the purpose of execution or appeal; and we think they are final as *res adjudicata* upon the facts then

- 14 -

existing. If such a decree should be regarded merely as an interlocutory order, without any force or effect as an adjudication, and if either party, as often as he chose, could relitigate the question of custody or support upon the same evidence and the same facts, great would be the inconvenience to the litigants, the courts, and the public; and any trial of the issues would be but an idle ceremony, since it would settle nothing.

The Court of Appeals then construed the statutory language authorizing "changes or modification [of a custody decree] as the exigencies of the case" required. Equating "exigencies" with "emergencies," the *Hicks* court interpreted the statute as follows:

We think an emergency here must be held to mean facts and conditions, which have emerged since the decree, new facts and changed conditions, which were not determined and could not be anticipated by the decree; and that the decree is final and conclusive upon all the facts and conditions which existed and upon which the decree was made.

*Armbrister*, 414 S.W.3d at 698–700 (internal citations and footnote omitted).

Under the current parenting plan statute, a litigant seeking to modify a residential parenting schedule must first prove that there has been "a material change in circumstances" since the entry of the previous parenting plan order. *Id.* The "material change in circumstances" step satisfies the requirements of *res judicata*. If a petitioner satisfies the court that a "material change in circumstances" has occurred, the litigant may move on to attempt to prove that a modification of the residential schedule is in the best interest of the child in light of the statutory best-interest factors (i.e., step two of the two-part analysis). *See id.* at 702–05. *Res judicata* does not bar a respondent/parent opposing a residential parenting schedule modification from putting on countervailing proof relevant to the best-interest analysis concerning the petitioner/parent's history of bad behavior just because that behavior took place before the entry of the last parenting plan. To hold otherwise would elevate the court's interest in finality over the best interest of the child. In *Teutken v. Teutken*, the Tennessee Supreme Court expressly stated that the best interest of the child comes before the court's interest in promoting finality in child custody matters, stating as follows:

Although an important factor, the need to promote finality is not the prevailing concern in resolving child-related matters. Rather, the prevailing concern is ensuring that the best interests of the child are protected. *See*

- 15 -

Tenn. Code Ann. § 36-6-106(a); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (holding that child custody awards are always subject to modification to ensure that the best interests of the child are protected).

*Teutken v. Teutken*, 320 S.W.3d 262, 272 (Tenn. 2010).

Father avers that the trial court was not permitted to consider evidence concerning any events which took place before the entry of the January 2013 Agreed Order. However, we hold that the trial court was permitted to consider all evidence relevant to the best-interest factors. *See* Tenn. Code Ann. § 36-6-106(a)(1)–(15).

### C. Abuse of Discretion

Next, we consider whether the trial court abused its discretion in fashioning the permanent parenting plan. Father avers that the trial court abused its discretion by failing to follow the statutory mandate that courts must "order a custody arrangement that permits both parties to enjoy the maximum participation in the life of the child consistent with the" best-interest factors. *See* Tenn. Code Ann. § 36-6-106. He argues that only a parenting plan "with substantially equal intervals of time for each parent" would meet the mandate in this case. Moreover, Father argues, "[i]n this case, having made evidentiary errors, errors of law, and assigning undue weight to other evidence, the trial court's final, and biggest abuse of discretion—to refuse to apply the statute as written by denying Dr. Wiseman that maximum participation in the Child's life—must be remedied." Therefore, Father urges this Court to vacate the trial court's order and adopt his proposed parenting plan. We respectfully decline to do so.

"The scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments is very limited." *See Steakin v. Steakin*, No. M2017-00115-COA-R3-CV, 2018 WL 334445, at *6 (Tenn. Ct. App. Jan. 9, 2018) (citations omitted). As noted earlier in this Opinion, "the specific modifications a trial court adopts to address a material change in circumstances and to serve the best interests of the children are the kinds of details an appellate court should not 'tweak' absent an abuse of discretion." *Armbrister*, 414 S.W.3d at 706 (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). An abuse of discretion occurs only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from the application of correct legal standards to the evidence presented at trial. *Id*. "The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal." *Eldridge*, 42 S.W.3d at 88.

The trial court did not abuse its discretion by modifying the parties' residential parenting schedule in light of the best-interest factors. In affirming the decision of the trial court, we point out that "[t]he rights and desires of the parents should not be ignored

- 16 -

[when a court fashions a parenting plan], but ultimately those rights and desires are secondary to the welfare and best interest of the child." *Pizzillo v. Pizzillo*, 884 S.W.2d 749, 755 (Tenn. Ct. App. 1994). In this case, the trial court recognized the importance of stability and consistency and clearly attempted to fashion a parenting plan to minimize conflict in the Child's life and ensure each parent could continue to have a close relationship with the Child. For example, to minimize the parties' on-going dispute concerning the location of the Child's extracurricular activities, the trial court ordered that the Child could only participate in extracurricular sports in Sumner County (i.e., Mother's county of residence), unless the activity is sponsored by Father's church. The trial court clarified that the "right of first refusal" did not apply to cases in which the Child attends a birthday party or sleepover. Furthermore, the trial court clarified that decisions regarding "routine" healthcare such as dental cleanings and flu shots were not "major non-emergency healthcare" decisions requiring a joint decision. At Mother's request, Father's parenting time was adjusted so that Mother would not have to go for extended periods in the summer without seeing the Child. At Father's request, he was awarded an additional night of parenting time during the school week. These modifications were clearly reasonable in light of the evidence in the record. Therefore, the trial court did not abuse its discretion in modifying the parties' parenting plan.

### D. Attorney's Fees

Father avers that the trial court abused its discretion in awarding Mother a portion of her attorney's fees because, he alleges, Mother was not the prevailing party.[9] Additionally, Mother seeks to recover her attorney's fees incurred on appeal.

Ex-spouses may recover attorney's fees incurred in actions to enforce decrees for alimony and child support, as well as in regard to suits concerning the adjudication of child custody. *See* Tenn. Code Ann. § 36-5-103(c). "The trial court is vested with wide discretion when determining whether to award attorney's fees." *Steakin*, 2018 WL 334445, at *8 (citations omitted). Accordingly, we will not reverse a trial court's decision to award attorney's fees absent a showing that the trial court has abused its discretion. *Id*.

The trial court explained its reasoning for awarding attorney's fees in its final order, stating as follows:

> The primary goal in this matter, as asserted by the father in open Court, was to secure equal parenting time with the parties' minor child (182.5 days annually) and to be allowed to make the major decisions for the minor child

---

[9] Mother asked the trial court to award her $47,275.00 out of a total of $57,235.00 she had incurred in attorney's fees. The trial court ordered that Father pay Mother $18,345.00 for a portion of the cost of her attorney's fees.

- 17 -

regarding elective medical treatment and involvement in extracurricular activities. After lengthy hearing on these and other matters, the Court finds that the mother prevailed, in that the father did not secure equal parenting time for the reasons specifically determined and announced by the Court, and further the responsibility for major decisions remained unchanged. Further, the Court finds that father's gross income is over three (3) times that of mother as evidenced by the record.

Having reviewed the record and the totality of the circumstances, we have concluded that the trial court did not abuse its discretion in awarding Mother a portion of her attorney's fees. As the trial court pointed out, Father sought equal parenting time and major-decision making authority over decisions related to the Child's non-emergency healthcare, extracurricular activities, and education. However, his parenting time was reduced by nineteen days, and he was not awarded major decision-making authority. Mother was the prevailing party. Thus, we affirm the trial court's decision to award Mother a portion of her attorney's fees.

Additionally, Mother seeks to recover for the costs of her attorney's fees incurred during this appeal. Whether to award attorney's fees on appeal is within this Court's sole discretion. *Wills v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014) (citation omitted). "We consider the following factors in our decision to award fees: (1) the requesting party's ability to pay the accrued fees; (2) the requesting party's success in the appeal; (3) whether the requesting party sought the appeal in good faith; and (4) any other relevant equitable factors." *See, e.g., Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *8 (Tenn. Ct. App. Apr. 29, 2015) (citing *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007)). It appears, from the record, that Father's salary is approximately three times greater than Mother's. Thus, he is in a better position to bear the burden of these costs. Moreover, Father has failed to prevail in this appeal, just as he did not prevail in the trial court. Having considered all the relevant factors, we grant Mother's request for attorney's fees incurred in this appeal, and remand this case to the trial court for a calculation of the reasonable amount of these fees.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Additionally, Mother is awarded her attorney's fees on appeal. This case is remanded for the trial court to calculate the amount of reasonable attorney's fees Mother has incurred on this appeal and to enter a judgment for such fees against Father and for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE